## UNITED STATES *v.* ERIE RAILWAY COMPANY.

During the period when sect. 122 of the act of June 30, 1864, c. 173, as amended by the act of July 13, 1866, c. 184, was in force, a railway company paid to alien non-resident holders of its bonds the entire interest due from time to time thereon. *Held,* that the company, no claim having been made here against it for any penalty, is liable to the United States for five per cent on the amount so paid, with interest thereon at the rate of six per cent per annum.

ERROR to the Circuit Court of the United States for the Southern District of New York.

This was an action to recover taxes alleged to be due to the United States, the plaintiff, on certain interest coupons paid by the Erie Railway Company, the defendant, in the years 1866, 1867, 1868, and 1869, on bonds previously issued by it; and also certain penalties alleged to be due the plaintiff for failure of the defendant to make returns of the amount of the taxes. It was tried in the District Court upon an agreed statement of facts, of which the following are all that are deemed material to explain the question raised and decided. Prior to Sept. 1, 1866, the defendant had issued sterling coupon bonds to the amount of £800,000, dated Sept. 1, 1865, the principal of which was payable two years after date, drawing interest at six per cent per annum, payable semi-annually on the first days of March and September of each year; and the principal and interest of which were payable in London, England, at the office of Junius S. Morgan & Co., bankers, of London; after March 1, 1868, and prior to Sept. 1, 1868, the defendant had issued and sold bonds of the same class amounting to £200,000, the principal and interest of which were payable at the same place as the bonds previously issued; all the bonds with coupons for interest attached were sold directly to J. S. Morgan & Co., J. T. Mackenzie, and Stern Brothers, all foreign bankers, having their places of business in London, and were by them sold to their customers in England and on the continent of Europe; during the years 1866, 1867, 1868, 1869, the bonds and coupons were all held by non-resident aliens, and not by citizens of the United States, except bonds to the amount of £20,000, and the coupons attached, which were held

and owned by a citizen or citizens of the United States residing in Europe; the amount of interest on all the bonds was provided for, and sent forward by the defendant, in one sum or block, to J. S. Morgan & Co., who, before the dates at which it fell due, and as it fell due, paid it, at their banking-house in London, to the holders of the bonds and coupons; the amount of interest paid in the years mentioned on the above-described bonds was £186,000, of which £4,200 were paid on the £20,000 held by a citizen or citizens of the United States; the defendant made no returns to the assessor, or to any other officer of the internal revenue of the United States, of the payment of the interest, or any part thereof, nor did it ever pay to the United States, or to any one on their behalf, five per cent tax, or any tax on the interest, or any part thereof; nor did it withhold the tax, or any part thereof, from the amount of the interest, but paid the full amount to the holders of the bonds; and no assessment was ever made by the plaintiff, or by any officer of the plaintiff, on the defendant for any portion of the tax, nor was any demand ever made on the defendant for the payment of the same to the United States until Dec. 31, 1872.

The court held that the company was not liable for a tax on the £181,800 sterling paid for interest upon coupons and bonds owned and held by non-resident aliens, but was liable for the tax on £4,200 sterling paid for interest on coupons and bonds owned and held by citizens of the United States; and, also, that it was liable for only one penalty for failure to make return to the revenue officer of the amount paid. Judgment was rendered accordingly, which, on error, was affirmed by the Circuit Court. This writ of error was then brought by the United States. No claim for any penalty was made in the argument here on behalf of the United States, the only question presented for determination being whether the court below erred in holding that the company was not liable for the alleged tax of five per cent on the £181,800 sterling interest which it had paid to non-resident alien owners and holders of its coupons and bonds.

The action was founded on sect. 122 of the act of June 30, 1864, c. 173, as amended by the act of July 13, 1866, c. 184, which is as follows: "That any railroad, canal, turnpike, canal

navigation, or slack-water company, indebted for any money for which bonds or other evidence of indebtedness have been issued, payable in one or more years after date, upon which interest is stipulated to be paid, or coupons representing the interest, or any such company that may have declared any dividend in scrip or money due or payable to its stockholders, including non-residents, whether citizens or aliens, as part of the earnings, profits, income, or gains of such company, and all profits of such company carried to the account of any fund, or used for construction, shall be subject to and pay a tax of five per centum on the amount of all such interest or coupons, dividends or profits, whenever and wherever the same shall be payable, and to whatsoever party or person the same may be payable, including non-residents, whether citizens or aliens; and said companies are hereby authorized to deduct and withhold from all payments on account of any interest or coupons and dividends due and payable as aforesaid, the tax of five per centum; and the payment of the amount of said tax, so deducted from the interest or coupons or dividends, and certified by the president or treasurer of said company, shall discharge said company from that amount of the dividend, or interest, or coupon on the bonds or other evidences of their indebtedness, so held by any person or party whatever, except where said companies may have contracted otherwise. And a list or return shall be made and rendered to the assessor or assistant assessor on or before the tenth day of the month following that in which said interest, coupons, or dividends become due and payable, and as often as every six months; and said list or return shall contain a true and faithful account of the amount of tax, and there shall be annexed thereto a declaration of the president or treasurer of the company, under oath or affirmation, in form and manner as may be prescribed by the Commissioner of Internal Revenue, that the same contains a true and faithful account of said tax. And for any default in making or rendering such list or return, with the declaration annexed, or of the payment of the tax as aforesaid, the company making such default shall forfeit as a penalty the sum of one thousand dollars; and in case of any default in making or rendering said list or return, or of the payment of the tax, or any part thereof, as aforesaid,

the assessment and collection of the tax and penalty shall be made according to the provisions of law in other cases of neglect or refusal: *Provided*, that whenever any of. the companies mentioned in this section shall be unable to pay the interest on their indebtedness, and shall in fact fail to pay such interest, that in such cases the tax levied by this section shall not be paid to the United States until said companies resume the payment of interest on their indebtedness."

The case was argued for the United States at the last term by *Mr. Edwin B. Smith*, Assistant Attorney-General, and at the present term by *The Solicitor-General.*
: *Mr. William D. Shipman*, *contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This judgment is reversed on the authority of *Railroad Company* v. *Collector*, 100 U. S. 595, and the cause is remanded with instructions to enter a judgment in favor of the United States, for the equivalent in lawful money of the United States of the tax of nine thousand three hundred pounds sterling, with interest at the rate of six per cent per annum from the several times when the same became due and payable according to the agreed statement of facts on which the submission was made below. As no claim was made on the argument in this court, either for a penalty or for the currency value of the pounds sterling when the taxes fell due, we have not considered the questions which would have arisen if such a demand had been made. For these reasons the judgment will be without penalties and for the present value of the pounds sterling in lawful money.

*Reversed.*

MR. JUSTICE FIELD dissenting.

I am not able to agree with the majority of the court in the decision of this case. The tax which is sustained is, in my judgment, a tax upon the income of non-resident aliens and nothing else. The 122d section of the act of June 30, 1864, c. 173, as amended by that of July 13, 1866, c. 184, subjects the interest on the bonds of the company to a tax of five per cent,

and authorizes the company to deduct it from the amount payable to the coupon-holder, whether he be a non-resident alien or a citizen of the United States: The company is thus made the agent of the government for the collection of the tax. It pays nothing itself; the tax is exacted from the creditor, the party who holds the coupons for interest. No collocation of words can change this fact. And so it was expressly adjudged with reference to a similar tax in the case of *United States* v. *Railroad Company*, reported in the 17th of Wallace. There a tax, under the same statute, was claimed upon the interest of bonds held by the city of Baltimore. And it was decided that the tax was upon the bondholder and not upon the corporation which had issued the bonds; that the corporation was only a convenient means of collecting it; and that no pecuniary burden was cast upon the corporation. This was the precise question upon which the decision of that case turned.

A paragraph from the opinion of the court will show this beyond controversy. " It is not taxation," said the court, " that government should take from one the profits and gains of another. That is taxation which compels one to pay for the support of the government from his own gains and of his own property. In the cases we are considering, the corporation parts not with a farthing of its own property. Whatever sum it pays to the government is the property of another. Whether the tax is five per cent on the dividend or interest, or whether it be fifty per cent, the corporation is neither richer nor poorer. Whatever it thus pays to the government, it by law withholds from the creditor. If no tax exists, it pays seven per cent, or whatever be its rate of interest, to its creditor in one unbroken sum. If there be a tax, it pays exactly the same sum to its creditor, less five per cent thereof, and this five per cent it pays to the government. The receivers may be two, or the receiver may be one, but the payer pays the same amount in either event. It is no pecuniary burden upon the corporation, and no taxation of the corporation. The burden falls on the creditor. He is the party taxed. In the case before us, this question controls its decision. If the tax were upon the railroad, there is no defence; it must be paid. But we hold that the tax imposed by the 122d section is in substance and in law a tax upon the

income of the creditor or stockholder, and not a tax upon the corporation." See also *Haight* v. *Railroad Company*, 6 Wall. 15, and *Railroad Company* v. *Jackson*, 7 id. 262, 269.

The bonds, upon the interest of which the tax in this case was laid, are held in Europe, principally in England; they were negotiated there; the principal and interest are payable there; they are held by aliens there, and the interest on them has always been paid there. The money which paid the interest was, until paid, the property of the company; when it became the property of the bondholders it was outside of the jurisdiction of the United States.

Where is the authority for this tax? It was said by counsel on the argument of the case — somewhat facetiously, I thought at the time — that Congress might impose a tax upon property anywhere in the world, and this court could not question the validity of the law, though the collection of the tax might be impossible, unless, perchance, the owner of the property should at some time visit this country or have means in it which could be reached. This court will, of course, never, in terms, announce or accept any such doctrine as this. And yet it is not perceived wherein the substantial difference lies between that doctrine and the one which asserts a power to tax, in any case, aliens who are beyond the limits of the country. The debts of the company, owing for interest, are not property of the company, although counsel contended they were, and would thus make the wealth of the country increase by the augmentation of the debts of its corporations. Debts being obligations of the debtors are the property of the creditors, so far as they have any commercial value, and it is a misuse of terms to call them anything else; they accompany the creditors wherever the latter go; their *situs* is with the latter. I have supposed heretofore that this was common learning, requiring no argument for its support, being, in fact, a self-evident truth, a recognition of which followed its statement. Nor is this the less so because the interest may be called in the statute a part of the gains and profits of the company. Words cannot change the fact, though they may mislead and bewilder. The thing remains through all disguises of terms. If the company makes no gains or profits on its business and borrows the money to

meet its interest, though it be in the markets abroad, it is still required under the statute to withhold from it the amount of the taxes.   If it pays the interest, though it be with funds which were never in the United States, it must deduct the taxes.   The government thus lays a tax, through the instrumentality of the company, upon the income of a non-resident alien over whom it cannot justly exercise any control, nor upon whom it can justly lay any burden.

The Chief Justice, in his opinion in this case, when affirming the judgment of the District Court, happily condensed the whole matter into a few words.   " The tax," he says, " for which the suit was brought, was the tax upon the owner of the bond, and not upon the defendant.   It was not a tax in the nature of a tax *in rem* upon the bond itself, but upon the income of the owner of the bond, derived from that particular piece of property.   The foreign owner of these bonds was not in any respect subject to the jurisdiction of the United States, neither was this portion of his income.   His debtor was, and so was the money of his debtor; but the money of his debtor did not become a part of his income until it was paid to him, and in this case the payment was outside of the United States, in accordance with the obligations of the contract which he held.   The power of the United States to tax is limited to persons, property, and business within their jurisdiction, as much as that of a State is limited to the same subjects within its jurisdiction.   *State Tax on Foreign-Held Bonds,* 15 Wall. 300."

" A personal tax," says the Supreme Court of New Jersey, " is the burden imposed by government on its own citizens for the benefits which that government affords by its protection and its laws, and any government which should attempt to impose such a tax on citizens of other States would justly incur the rebuke of the intelligent sentiment of the civilized world." *State* v. *Ross,* 23 N. J. L. 517, 521.

In imposing a tax, says Mr. Chief Justice Marshall, the legislature acts upon its constituents.   " All subjects," he adds, " over which the power of a State extends are objects of taxation, but those over which it does not extend are, upon the soundest principles, exempt from taxation.   This proposition

may almost be pronounced self-evident." *McCulloch* v. *Maryland*, 4 Wheat. 316, 428.

There are limitations upon the powers of all governments, without any express designation of them in their organic law; limitations which inhere in their very nature and structure, and this is one of them, — that no rightful authority can be exercised by them over alien subjects, or citizens resident abroad or over their property there situated. This doctrine may be said to be axiomatic, and courts in England have felt it so obligatory upon them, that where general terms, used in acts of Parliament, seem to contravene it, they have narrowed the construction to avoid that conclusion. In a memorable case decided by Lord Stowell, which involved the legality of the seizure and condemnation of a French vessel engaged in the slave trade, which was, in terms, within an act of Parliament, that distinguished judge said: " That neither this British act of Parliament nor any commission founded on it can affect any right or interest of foreigners unless they are founded upon principles and impose regulations that are consistent with the law of nations. That is the only law which Great Britain can apply to them, and the generality of any terms employed in an act of Parliament must be narrowed in construction by a religious adherence thereto." *The Le Louis*, 2 Dod. 210, 239.

Similar language was used by Mr. Justice Bailey of the King's Bench, where the question was whether the act of Parliament, which declared the slave trade and all dealings therewith unlawful, justified the seizure of a Spanish vessel, with a cargo of slaves on board, by the captain of an English naval vessel, and it was held that it did not. The odiousness of the trade would have carried the justice to another conclusion if the public law would have permitted it, but he said, " That, although the language used by the legislature in the statute referred to is undoubtedly very strong, yet it can only apply to British subjects, and can only render the slave trade unlawful if carried on by them; it cannot apply in any way to a foreigner. It is true that if this were a trade contrary to the law of nations a foreigner could not maintain this action. But it is not; and as a Spaniard could not be considered as bound by the acts of the British legislature prohibiting this trade, it would be unjust to deprive

him of a. remedy for the heavy damage he has sustained."
*Madrazo* v. *Willes*, 3 Barn. & Ald. 353.

In *The Apollon*, a libel was filed against the collector of the
District of St. Mary's for damages occasioned by the seizure of
the ship and cargo whilst lying in a river within the territory
of the King of Spain, and Mr. Justice Story said, speaking for
the court, that "The laws of no nation can justly extend
beyond its own jurisdiction, except so far as regards its own
citizens. They can have no force to control the sovereignty or
rights of any other nation within its own jurisdiction. And
however general and comprehensive the phraseology used in
our municipal laws may be, they must always be restricted in
construction to places and persons upon whom the legislatures
have authority and jurisdiction." 9 Wheat. 362.

When the United States became a separate and independent
nation, they became, as said by Chancellor Kent, "subject to
that system of rules which reason, morality, and custom had
established among the enlightened nations of Europe as their
public law," and by the light of that law must their dealings
with persons of a foreign jurisdiction be considered; and ac-
cording to that law there could be no debatable question, that
the jurisdiction of the United States over persons and property
ends where the foreign jurisdiction begins.

What urgent reasons press upon us to hold that this doctrine
of public law may be set aside, and that the United States, in
disregard of it, may lawfully treat as subject to their taxing
power the income of non-resident aliens, derived from the
interest received abroad on bonds of corporations of this country
negotiable and payable there? If, in the form of taxes, the
United States may authorize the withholding of a portion of
such interest, the amount will be a matter in their discretion;
they may authorize the whole to be withheld. And if they can
do this, why may not the States do the same thing with refer-
ence to the bonds issued by corporations created under their
laws. They will not be slow to act upon the example set. If
such a tax may be levied by the United States in the rightful
exercise of their taxing power, why may not a similar tax be
levied upon the interest on bonds of the same corporations by
the States within their respective jurisdictions in the rightful

exercise of their taxing power? What is sound law for one sovereignty ought to be sound law for another.

It is said, in answer to these views, that the governments of Europe — or at least some of them, where a tax is laid on incomes — deduct from the interest on their public debts the tax due on the amount as income, whether payable to a nonresident alien or a subject of the country. This is true in some instances, and it has been suggested in justification of it that the interest, being payable at their treasuries, is under their control, the money designated for it being within their jurisdiction when set apart for the debtor, who must in person or by agent enter the country to receive it. That presents a case different from the one before us in this, — that here the interest is payable abroad, and the money never becomes the property of the debtor until actually paid to him there. So, whether we speak of the obligation of the company to the holder of the coupons, or the money paid in its fulfilment, it is held abroad, not being, in either case, within the jurisdiction of the United States. And with reference to the taxation of the interest on public debts, Mr. Phillimore, in his Treatise on International Laws, says: " It may be quite right that a person having an income accruing from money lent to a foreign State should be taxed by his own country on his income derived from this source; and if his own country impose an income tax, it is, of course, a convenience to all-parties that the government which is to receive the tax should deduct it from the debt which, in this instance, that government owes to the payer of the tax, and thus avoid a double process; *but a foreigner, not resident in the State, is not liable to be taxed by the State;* and it seems unjust to a foreign creditor to make use of the machinery which, on the ground of convenience, is applied in the cases of domestic creditors, in order to subject him to a tax to which he is not on principle liable." Vol. ii. pp. 14, 15.

Here, also, is a further difference: the tax here is laid upon the interest due on private contracts. As observed by counsel, no other government has ever undertaken to tax the income of subjects of another nation accruing to them at their own domicile upon property held there, and arising out of ordinary business, of contracts between individuals.

This case is decided upon the authority of *Railroad Company v. Collector*, reported in 100 U. S., and the doctrines from which I dissent necessarily flow from that decision. When that decision was announced I was apprehensive that the conclusions would follow which I now see to be inevitable. It matters not what the interest may be called, whether classed among gains and profits, or covered up by other forms of expression, the fact remains, the tax is laid upon it, and that is a tax which comes from the party entitled to the interest, — here, a non-resident alien in England, who is not, and never has been, subject to the jurisdiction of this country.

In that case the tax is called an excise on the business of the class of corporations mentioned, and is held to be laid, not on the bondholder who receives the interest, but upon the earnings of the corporations which pay it. How can a tax on the interest to be paid be called a tax on the earnings of the corporation if it earns nothing — if it borrows the money to pay the interest? How can it be said not to be a tax upon the income of the bondholder when out of his interest the tax is deducted?

That case was not treated as one, the disposition of which was considered important, as settling a rule of action. The opening language of the opinion is: "As the sum involved in this suit is small, and the law under which the tax in question was collected has long since been repealed, the case is of little consequence as regards any principle involved in it as a rule of future action." But now it is invoked in a case of great magnitude, and many other similar cases, as we are informed, are likely soon to be before us; and though it overrules repeated and solemn adjudications rendered after full argument and mature deliberation, though it is opposed to one of the most important and salutary principles of public law, it is to be received as conclusive, and no further word from the court, either in explanation or justification of it, is to be heard. I cannot believe that a principle so important as the one announced here, and so injurious in its tendencies, so well calculated to elicit unfavorable comment from the enlightened sentiment of the civilized world, will be allowed to pass unchallenged, though the court is silent upon it.

I think the judgment should be affirmed.