## MEMPHIS & CHARLESTON RAILROAD COMPANY v. UNITED STATES.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TENNESSEE.

Decided April 2d, 1883.

*Dividends—Internal Revenue—Tax.*

1. A railroad company whose railroad was in the military possession of the United States during the civil war, and whose rolling stock was in the possession of the company within the confederate lines, and which earned or distributed dividends during the war by the use of its rolling stock, which dividends were paid in confederate notes, is *held* liable to pay an income tax on the dividends so earned and paid.

2. A railroad company which after the close of the civil war, with the consent of its stockholders, applied its surplus earnings to the restoration of its property and distributed to its stockolders bonds at a discount in lieu of money, with option, however, to take money, is *held* not liable to an income tax on the income so applied.

3. On the facts in this case the court finds no error in the instruction to the jury respecting the exclusion of evidence in regard to the understanding of the defendants below about an alleged compromise.

Suit to recover income tax. The principal facts appear in the opinion of the court. The questions argued were :

1st. Whether the railroad company was liable for a tax upon its income during the war, earned from the use of its rolling stock within the confederate lines, and divided ; its road being at the time the dividends were earned in the military possession of the United States?

2d. Whether it was liable for an income tax on income earned after the war and applied to construction and repair of the road with consent of the stockholders, who received mortgage bonds at a discount for their dividends, having the option to receive cash ?

3d. Whether a compromise effected between the parties was a bar to the suit, and whether the evidence of the understanding of that compromise by the company was improperly excluded at the trial ? It appeared that the United States made claim against the company for 5 per cent. tax on coupons of

the company's mortgage bonds, amounting to $438,550. The tax amounted to $21,927.50. There was also a claim for penalty and an assessed penalty, aggregating $25,940.25. The company offered $24,000 : the government accepted $24,038.25, which was paid, and the following receipt taken :

" UNITED STATES INTERNAL REVENUE,

" COLLECTOR'S OFFICE, 8TH DISTRICT, TENN.,

" *Memphis, Sept.* 24, 1870.

" Received of M. J. Wicks, president Memphis and Charleston Railroad Company, twelve thousand dollars, being balance due on twenty-four thousand thirty-eight and $\frac{25}{100}$ dollars for penalty of neglect to make returns of interest on its bonds maturing from May, 1866, to July, 1869, agree'bly to instructions from commissioner under date of August 27th, 1870, accepting proposition in compromise made to him by Memphis & Charleston Railroad Company.

" $12,000.00.]     R. F. PATTERSON, *Collector.*"

*Mr. Humes* for the plaintiff in error.—I. During the period from June 6th, 1862, to Sept. 12th, 1865, by a military power the persons in charge of this railroad, with all its rolling stock and equipments, were forcibly detained within the military lines of the confederate armies. It would have been physically impossible for these persons in charge of said company to know of the existence of these laws ; it would have been in violation of the acts of Congress of the United States, and of the laws of war for the defendant company and those in charge of it, to have attempted to communicate with the government, or officers or people of the United States outside of the confederate military lines. It would have been equally illegal for the persons in charge of the defendant company to have attempted to deduct the 3 per cent. tax from the coupons as they were paid, or to have attempted to make the report, or to make the payment of the tax, or to have assessed the tax. This country which the confederate military authorities and forces held in possession from June, 1862, to September, 1865, the enemy held that firm possession of, which enabled this enemy to exercise the fullest rights of sovereignty over. And over this territory

the sovereignty of the United States was of course suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the military occupation the inhabitants passed under a temporary allegiance to the confederate government, and were bound by such laws, and such only, as it chose to recognize and impose. From the nature of the case, no other laws could be obligatory upon them, for where there is no protection, or allegiance, or sovereignty, there can be no claim to obedience. *United States* v. *Rice*, 4 Wheat. 246 ; *Thorington* v. *Smith*, 8 Wall. 1 ; *Hanauer* v. *Woodruff*, 15 Wall. 439 ; *Fleming* v. *Page*, 9 How. 603 ; *Nelson* v. *Dean*, 10 Wall. 172 ; *Lasere* v. *Rochereau*, 17 Wall. 437.—II. The case on the compromise therefore showed a demand by the government of all taxes due on account of coupons and dividends, a report by Wicks as president of the company giving all he knew of as due ; and although his report apparently only covered coupons from January, 1866, yet in fact it included and embraced the coupons that fell due and were paid before 1866, that is, the very coupons on which the tax is claimed as now due under this suit. Wicks proposed to pay the $24,000 if accepted and receipted " for in full for all past due taxes, fines and penalties, &c., due in the United States arising out of the failure to report payment of coupons." This proposal was accepted, and the money received as tax in full. The plea of accord and satisfaction is made out, and should have been sustained by the court.

*Mr. Solicitor-General* (*Mr. J. S. Blair* was with him) for the United States.—I. The funding in second mortgage coupons was done after June 1st, 1866. By the act of 1864 the tax became due whenever the interest was payable. Instalments of interest which had matured prior to June 30th, 1864, although under the act of 1864 taxable only when "paid," became the subject of tax *eo instanti* on the passage of the act of 1864, being then "payable ; " so far, therefore, as this funding was of interest which matured prior to June 13th, 1866, it makes no difference whether the interest was or was not *paid*. Its pay-

ment in second mortgage bonds was therefore immaterial. After that date, in order to relieve the company from the tax, proof was required not merely of actual failure to pay such interest, but also of *inability* to pay.—II. The defendant sought to escape liability, on the ground that some of the interest coupons and all of the dividends were paid in confederate money. The force to be given to transactions based upon such currency has been frequently considered by this court. The following cases seem to be decisive of this exception. *Thorington* v. *Smith*, 8 Wall. 1 ; *The Confederate Note Case*, 19 Wall. 548; *United States* v. *Villalonga*, 23 Wall. 35 ; *Wilmington, &c., Railroad Company* v. *King*, 91 U. S. 5 ; *Stewart* v. *Salamon*, 94 U. S. 434.

Mr. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit to recover taxes upon dividends and interest paid by the Memphis & Charleston Railroad Company between the first day of July, 1862, and the first day of December, 1865. The items which go to make up the amount of the judgment brought here for review are thus stated in the verdict of the jury :

1. "On dividend declared March 17, 1863, a tax of $1,625.45, being three per centum of $57,515.60, the value in legal currency, when paid, of $143,789, the whole amount of said dividend then paid in Confederate money."

2. "On interest coupons of said defendent falling due November 1, 1862, May 1, 1863, November 1, 1863, and May 1, 1864, a tax of $819.17, being three per cent. on $27,326.55, the value, when paid, in legal currency, of $88,935, the portion of such coupons paid in Confederate money ; and the further tax of $2,274.45 on the remaining portion of said coupons falling due as aforesaid, being three per cent. on $75,815.83, such remaining portion of said coupons."

3. "On interest coupons of said defendant falling due November 1, 1864, May 1, 1865, and November 1, 1865, a tax of $6,793.50, the same being five per centum on $135,870, the amount of said last-named coupons."

The questions presented by the bill of exceptions may be separated into three classes, as follows:

1. Those which relate to dividends and interest paid in Conferate money and during the late civil war;

2. Those which relate to the payments of interest after the close of the war; and,

3. Those which relate to an alleged compromise between the United States and the railroad company under date of September 24th, 1870.

These will be considered in their order.

1. As to payments in Confederate money.

Upon this branch of the case the facts are these: At the beginning of the war the Memphis and Charleston Railroad Company was the owner of an equipped line of railroad extending from Memphis, in the State of Tennessee, through the States of Tennessee, Mississippi, and Alabama, to Stephenson, in the last-named State. It was divided into two divisions, one known as the Eastern Division, extending from Stephenson westward to Bear Creek, on the line between Mississippi and Alabama, having its principal office at Huntsville, Alabama; and the other, known as the Western Division, extending from Bear Creek to Memphis, and having its principal office at Memphis. On the 11th of April, 1862, the military forces of the United States took possession of the Eastern Division of the road, with all its rolling stock and equipment, and kept it until the close of the war. The Western Division was run by the officers of the company under the control of the military superintendent of the Confederate authorities until the 6th of June, 1862, when it was taken possession of by the United States. Three days before the capture of Memphis by the military forces of the United States the officers and rolling stock of the Western Division were moved south within the Confederate lines by command of the Confederate military authorities, and were kept there until the end of the war. During this period the rolling stock was hired by the officers of the company to other railroad companies, and in this way a large amount in Confederate treasury notes came into the hands of the officers of the company within the Confederate

lines. On the 17th of March, 1863, a resolution was passed within the Confederate lines declaring a dividend of four per cent. on the capital stock, payable in Confederate treasury notes on the 15th of April. Under this resolution payments were made to the amount stated in the verdict. The Confederate money used to pay the coupons, as stated in the verdict, was all obtained from the hire of the rolling stock within the Confederate lines.

Upon this state of facts the court instructed the jury, in substance, that the United States were entitled to such a verdict as was rendered, and the question presented here is, in effect, whether that instruction was right.

At the times when the dividend and interest now in question were paid, the entire railroad of the company and its two principal offices were within the lines of the military forces of the United States. The act of 1862, c. 119, which provided for the tax, was not passed until after the United States had established their military possession of the territory traversed by the railroad, and within which the principal offices were located. The corporation was, therefore, subject to the actual governmental control of the United States, and the laws of the United States were both operative upon and enforcible against it. No one will deny that the internal revenue laws were intended to reach all persons and corporations within the dominion of the United States against whom they could for the time being be enforced by judicial process or otherwise. They were broad enough in their language to embrace all, and could be limited only in their operation by the power of the United States to enforce them. Clearly, then, if this dividend had been declared, and the dividend and interest paid at either of the principal offices of the company, or within the military lines of the United States, the taxes sued for would have been recoverable, notwithstanding the payments were made out of earnings derived from the use of property which had been taken inside the lines of the enemy. Thus the question now to be determined seems to be whether the company is exempt from the tax, because the resolution declaring the dividend was adopted within the Confederate lines, and the payments, on

account of which the taxes are demanded, were actually made there.

In *Railway Company* v. *Collector*, 100 U. S. 595, followed in *Erie Railway Company* v. *The United States*, 106 U. S. 327, it was held that the internal revenue tax on interest and dividends was an excise tax on the business of corporations, to be paid by the corporations out of their earnings, income and profits. The payments made in this case were for dividends to stockholders and interest to bondholders out of the earnings, income, and profits of the corporation in its business. By means of the dividend the surplus earnings were distributed to the stockholders, and the debts of the company were discharged to the extent of the interest paid. In this way the earnings on the inside of the Confederate lines were made available to the corporation which was subject to the actual control of the United States, and bound for the payment of all internal revenue taxes chargeable by law against it. To our minds it is a matter of no importance that the income came from property which was within Confederate territory. The property, although within the Confederate lines, belonged to the company, and the income derived from its use was actually paid out by the company in dividends to stockholders, and to discharge the corporate debts for interest. We think it would hardly be claimed that if a private individual, living in one of the loyal States during the war, derived an income which he actually reduced to possession, or used in the payment of debts, from property in Confederate territory, he would be exempt from the income tax imposed on him by the internal revenue laws, because of the source from which his income was derived; and if he would not be, it is difficult to see how this corporation is. In both cases the tax is in legal effect on the income of persons subject to the actual dominion and control of the United States. The tax is payable by the person because of his income, according to its amount, and without any reference to the way in which it was obtained.

Under the instructions which were given the jury the verdict was only for the taxes on the value of the Confederate treasury notes in legal currency at the times the dividend and interest

were paid. In this way the company has only been charged with an income estimated in lawful money. Without, therefore, considering in detail the particular instructions given to the jury or refused as stated in the bill of exceptions, it is sufficient to say that upon the undisputed facts it would have been proper for the court to have directed the verdict for the United States which was given in this branch of the case.

2. As to the payments of interest not made in Confederate notes.

All these payments were made after the close of the war, and there is no pretence that they were made out of earnings or income. The statement in the bill of exceptions is that they were paid " either in cash or in second mortgage bonds of the defendant company at a discount, at the option of the holder." As to this the court instructed the jury as follows:

" The defendant's counsel insists that a portion of the interest on which a tax is claimed by the plaintiffs was funded in second mortgage bonds of the company, and that such funding did not amount to a payment of such interest. If you find that any of the interest on the bonds of the defendant on which a tax is claimed in this suit was so funded, and that it was optional with the holders of such interest coupons to have the same paid in cash or funded in second mortgage bonds at a discount, I charge you that if such holders of interest coupons took second mortgage bonds in preference to the cash, that it did amount to a payment, and the plaintiffs would be entitled to recover the tax claimed on the amount so funded."

And again:

" It is in proof that some of the coupons were not paid in cash, but were funded in second mortgage bonds. It appears that the creditor had his option to take payment in cash, or take these new bonds at a certain agreed discount. It was, therefore, substantially a payment in cash, and a reinvestment of the amount in second mortgage bonds. This can constitute no defence to the suit."

In this, we think, there was error. Although the tax is im-

posed on interest, paid, the evident intention of Congress was to tax only such payments as were either in fact or in legal effect made from the income.   As was said in *Railroad Company* v. *Collector, supra*, "the tax  .  .  .  is essentially an excise on the business of the class of corporations mentioned in the statute.   The section is a part of a system of taxing incomes, earnings, and profits, adopted during the late war, and abandoned as soon after the war was ended as it could safely be done."   Under ordinary circumstances, it will be conclusively presumed that payments of interest were made from earnings, but when it appears that at the end of a civil war, during which interest had fallen in arrear, and earnings had been substantially suspended, the company, in reorganizing its affairs for future business, either funded its past due coupons in a new issue of bonds, or paid them from the proceeds of the sales of new bonds, no such presumption can arise, and if the facts are established they will constitute a complete defence to a suit for the recovery of a tax charged on such payments of interest.   Any other construction would be in violation of the whole spirit and purpose of the statute.   The bondholder would undoubtedly be taxable for his income derived in that way, but the payment would not be one upon which the company could be taxed.

3. As to the alleged compromise.

Without recapitulating the facts connected with this part of the case, it is sufficient to say that in all the correspondence which preceded the payment of the money on the 24th of September, 1870, and in the receipt given for the money when paid, reference was had only to the payments of interest maturing from May, 1866, to July, 1869.   It was not erroneous, therefore, for the court to exclude all testimony showing a different understanding on the part of the officers of the company, and to instruct the jury that the legal effect of the papers in evidence was to confine the compromise to the claims of the United States for taxes and penalties growing out of the interest maturing between the dates specified in the receipt of the collector.   It nowhere appears that the officers of the United States had any knowledge of the payments,

either of interest or dividends, which had been made at earlier dates.

There are other assignments of error, but those already considered dispose of the entire case in a way to render the others immaterial on another trial.

*The judgment is reversed, and the cause remanded for such further proceedings, not inconsistent with this opinion, as justice may require.*