THE TERRE HAUTE AND INDIANAPOLIS RAILROAD COMPANY *v.* STATE, EX REL. KETCHAM, ATTORNEY-GENERAL.

[No. 19,728. Filed November 25, 1902.]

CORPORATIONS. — *Charter.* — *Amendments.* — *Railroads.* — The act of 1897 (Acts 1897, p. 59) amending the act of 1847 (Local Laws 1847, p. 77), creating a corporation with power to construct a railroad, providing for an accounting to the use of the common schools, authorizing the Attorney-General to demand such accounting, and to institute suit upon failure so to do, is valid as providing a remedy for enforcing the preëxisting charter obligations of the corporation. *pp. 444, 445.*

SAME. — *Railroads.* — *Dividends.* — *Tolls.* — *Regulation by State.* — *Statutes.* — The provision of section twenty-three of the act of 1847 (Local Laws 1847, p. 77), creating a corporation with power to construct a railroad, "that when the aggregate amount of dividends declared shall amount to the full sum invested and ten *per centum* per annum thereon, the legislature may so regulate the tolls and freights that not more than fifteen *per centum* per annum shall be divided on the capital employed, and the surplus profits, if any,

Terre Haute, etc., R. Co. *v.* State, *ex rel.*

after paying the expenses and reserving such portion as may be necessary for future contingencies, shall be paid over to the Treasurer of State for the use of the common schools," etc., does not require the legislature, as a condition precedent to the State's right to the earnings in excess of fifteen *per centum*, to regulate the tolls and freights of the company. *pp. 445–456.*

CORPORATIONS. — *Railroads.* — *Charter.* — *Construction.* — *Capital Employed.*—The words "the full sum invested" and "capital employed" as used in section twenty-three of the act of 1847 (Local Laws 1847, p. 77), providing that when the aggregate amount of dividends declared by the railway company created by the act shall amount to "the full sum invested" the legislature may so regulate the tolls and freights that not more than fifteen *per centum* shall be divided on "the capital employed" embraces only such sums as were contributed directly by those who purchased the corporation stock for the construction of the road and the sum paid for bonds that were issued and used for construction and subsequently converted, under their provisions into shares of stock. *pp. 456–461.*

JUDGMENT.—*Res Judicata.* — *Defective Complaint.* — *Corporations.* — *Railroads.*—Where by the provisions of a statute authorizing the creation of a corporation with power to construct a railroad, it was provided as a condition precedent to any duty on the part of the corporation to pay or account to the State for money received that certain collateral things were to be done, such as building the road, earning money, paying expenses, making repairs and improvements, restoring the sums contributed for construction and equipment, reserving a sufficient sum to meet future contingencies and providing a fifteen per cent. current dividend, no duty was imposed upon the corporation to make an accounting to the State until requested by the proper authorities, and a judgment in favor of the corporation upon a complaint by the State for an accounting, in which no demand was alleged, does not constitute an adjudication of a proper suit by the State for an accounting. *pp. 461–467.*

SAME. — *Res Judicata.* — *Defective Complaint.* — A judgment for defendant, on demurrer to the complaint, by reason of the omission of an essential allegation therein, will not bar a subsequent suit upon a complaint in which the omitted allegation is supplied. *p. 470.*

SAME. — *Res Judicata.* — *Action Premature1y Brought.* — A judgment against a plaintiff because his action is prematurely brought will not bar a suit subsequently brought after the cause of action has properly accrued. *p. 470.*

SAME.—*Res Judicata.*—*Form of Complaint.*—*Evidence.*—Where judgment was rendered for defendant on demurrer to a complaint on the ground that the complaint failed to state a cause of action,

no error was committed in refusing to admit in evidence, in a subsequent action involving the same subject-matter, the written opinion of the judges who sat in the former case to show that the judgment was in fact upon the merits, and not upon the form of the complaint. *pp. 471, 472.*

JUDGMENT.—*Res Judicata.—Evidence.*—No error was committed in the trial of an action by the State against a railroad company for an accounting in refusing to admit in evidence an agreement between the company and the State to submit the question of the company's liability in the former action as tending to show a former adjudication; since the agreement was to submit the State's claim upon the facts as they existed at that time, not as it was after more profits had been received and a cause of action accrued. *pp. 472, 473.*

CORPORATIONS.—*Railroads.—Amendment of Charter.*—The amendment of 1851 (Local Laws 1851, p. 80), of the act of 1847 (Local Laws 1847, p. 77), creating a corporation with power to construct a railroad, and imposing certain obligations, whereby the corporation was relieved of the construction of a portion of the road and the power conferred upon another corporation upon the request of the former, and the acceptance by such corporation in 1873 of the general railroad law of 1852, did not relieve the corporation from unperformed duties assumed by it under its charter contract of 1847. *pp. 473, 474.*

LIMITATION OF ACTIONS.—*Charter of Railroad Company a Written Contract.*—A special charter granted by the State authorizing a company to construct a railroad, constituted a written contract, without the written acceptance on the part of the company, where the company acted under the charter, exercised the right of eminent domain, took possession of real estate, constructed a railroad and operated it; and an action thereon is not barred by the six years' statute of limitation (repealed as to the State in 1881). *pp. 474-476.*

SAME.—*Officers.—Laches.*—A suit by the State against a railroad company created by the act of 1847 (Local Laws 1847, p. 77) to recover surplus profits, is not barred by laches on the part of the State's officers to recover the same. *p. 478.*

TRIAL.—*Special Findings.—Request for.—Master Commissioner's Report.*—The signed writing or record of a trial judge, containing the approved and disapproved items of a master commissioner's report of a suit in equity against a railroad company for an accounting, and the conclusions of law stated in ruling upon exceptions thereto, made without request by either party for a special finding, is a general finding only, and specific findings and rulings can form no basis for appealable error. Jordan, J., dissents. *pp. 479, 480.*

SAME.—*General Finding.—Appeal and Error.*—Where in an action by the State against a railroad company created under the act of

Terre Haute, etc., R. Co. v. State, ex rel.

1847 (Local Laws 1847, p. 77), for the recovery of surplus profits under the provision of the statute, there was a general finding for the State for a designated sum without disclosing in detail the conclusion reached by the court, and enough of the items sued for are sustained by the evidence to equal the amount of the recovery, it is immaterial whether certain taxes paid by the corporation were paid as an excise on the earnings, and so a charge against the corporation, or a tax on the dividends declared, and therefore a charge against the stockholders. Jordan, J., dissents. p. 483.

TRIAL.—*Master Commissioner.*—The action of the trial court in referring a suit, brought by the State, under the act of 1847 (Local Laws 1847, p. 77), against a railroad company for the recovery of surplus profits, as in the act provided, to a master, was not error. p. 487.

From Marion Superior Court; *Vinson Carter*, Judge.

Suit by the State on the relation of W. A. Ketcham, Attorney-General, against the Terre Haute and Indianapolis Railroad Company for an accounting. From a judgment for plaintiff, defendant appeals. *Affirmed.*

*J. G. Williams, S. N. Chambers, S. O. Pickens, C. W. Moores* and *Lawrence Maxwell, Jr.*, for appellant.

*W. A. Ketcham, R. S. Taylor, R. O. Hawkins* and *F. Winter*, for appellee.

HADLEY, C. J.—Suit by appellee for an accounting, to the use of the common schools, for earnings in excess of amount authorized by law.

The facts material to a decision of the case not disclosed in the opinion are these:  The General Assembly by an act approved January 26, 1847 (Local Laws 1847, p. 77), constituted a number of gentlemen named, and their successors in office, a body corporate and politic under the name of "The President and Directors of the Terre Haute & Richmond Railroad Company" with full power to construct and operate a railroad from a point on the western line of the State of Indiana, and running thence eastwardly through Terre Haute, Greencastle, and Indianapolis to Richmond, in Wayne county. The authorized capital was $800,000, which might be increased if found necessary.

The corporation might borrow money, but no power was given to mortgage its property; and if the directors contracted debts beyond the amount of the good solvent subscriptions to the capital stock, such directors should be personably liable. The corporation might fix its own rates for the transportation of freights and passengers, and when the stockholders should receive as dividends an amount equal to the full sum invested, and ten per cent. per annum, the legislature might then regulate the tolls, and all net profits thereafter accruing, above a sum sufficient to pay fifteen per cent. dividends, and to meet future contingencies, should be paid to the Treasurer of State for the use of common schools.

In 1851 the corporation was authorized to mortgage its property to raise money for construction and equipment, and at the same session (Local Laws 1851, p. 80), upon solicitation of its officers, the company was relieved from the construction of that part of the proposed road east of Indianapolis. In 1865 the corporation name was changed to "The Terre Haute & Indianapolis Railroad Company," which name it still retains. The road was opened to traffic in the fall of 1851 between Terre Haute and Indianapolis. Improvements, however, were continued through the years 1852, 1853, 1854, and 1855, and to November 30, 1856, when the construction account was declared closed. The company commenced paying dividends to its stockholders in 1852, and in every year thereafter to 1873, when it surrendered its special charter and organized under the general railroad laws of 1852, paid regular and large extra dividends.

About the close of 1872 the prosecuting attorney of Putnam county instituted a *quo warranto* proceeding in the Putnam Circuit Court to forfeit the charter of the company. On a change of venue to Owen county, a trial was had which resulted in a disagreement of the jury. Pending this action a written agreement was entered into between

the State and appellant, which stipulated that a suit should be brought in the Marion Superior Court for any money claimed to be due the State, and if it should be determined in said suit that nothing was due the State from appellant, then the *quo warranto* action in the Owen Circuit Court should be dismissed; and if it should be found that money was due the State, the sum so found should be paid before the dismissal of said suit. Pursuant to this agreement the State, *ex rel* the Attorney-General, brought suit against appellant in the Marion Superior Court in 1875. The complaint contained three paragraphs. The first and second paragraphs sought to recover money due the common school fund under the twenty-third section of appellant's charter. The third paragraph sought to recover money paid by the State to appellant for the transportation of troops and munitions of war. Appellant filed a demurrer to each paragraph of that complaint for insufficiency of facts, and each of said demurrers was sustained; the judges filing a written opinion in which they purported to state the grounds of their judgment. The State refusing to amend, judgment was rendered in favor of the company on the demurrers. On the State's appeal to this court, the judgment of the superior court was affirmed in 1878 on the ground of irregularity and insufficiency of the record. *State, ex rel., v. Terre Haute, etc., R. Co.,* 64 Ind. 297.

In 1897 the legislature passed three acts,—one, approved January 27th, to require appellant to account to that body pursuant to section twenty-three of its charter, for the amount expended in construction and operation of its road from January 26, 1847, to January 17, 1873, and the total earnings, profits, etc., for that period; one, approved February 24th, purporting to amend said original section twenty-three so as to require the excess of profits paid over to the Treasurer of State semiannually on the first Monday of July and December; and the third approved March 4th, providing for an accounting to the use of the common

schools, authorizing the Attorney-General to demand such accounting, and to institute suit upon failure so to do. Acts 1897, pp. 8, 59, 145.

The appellant neglected to render an account, and pursuant to this latter legislation this action was commenced in April, 1897. The complaint is in one paragraph, reciting the above and other material facts with much elaboration. A demurrer for want of facts was overruled, and appellant answered in eleven paragraphs. The first was a general denial. The second set up the legislative consent of 1851 to the company's abandonment of the construction of that part of the proposed railroad lying east of Indianapolis, and appellant's acceptance of the general railroad law of 1852 in bar of the State's right to recover. The third pleaded the judgment in the Marion Superior Court of 1876 as a former adjudication. The fourth was an argumentative denial. The fifth, sixth, seventh, eighth, ninth, and tenth presented the statute of limitations in various forms; the ninth that the cause of action accrued more than twenty years prior to the 19th day of September, 1881. The eleventh, acquiescence and laches on the part of the State, in bar of the action. A demurrer was sustained to each paragraph of the answer except the first, third, and ninth. A reply was filed to the third and ninth. Upon the closing of the issues the case was referred, over the objection of appellant, to a master commissioner, to hear and report to the court the evidence, together with his findings of fact and conclusions of law thereon. Exceptions were filed to the master's report by both plaintiff and defendant, and upon final hearing by the court, judgment was given the plaintiff for $913,905. A new trial was denied the defendant, and it appeals. Errors and cross-errors are assigned on all adverse rulings.

The State's action is based upon the obligations assumed by appellant in the acceptance of its original charter of 1847, or it has no case. This, in effect, is conceded by

the State's counsel. An effort of the General Assembly, by amendatory legislation in 1897, to create in the State a right in the earnings of appellant, where none existed before, or to impose upon appellant any new charter liability or obligation, would be so clearly unconstitutional as to leave no ground for argument. We are, therefore, inclined to dismiss the first contention with the observation that in so far as either of the acts of 1897, *supra,* attempts, if either does so attempt, to increase the liabilities, or impose any new burden upon, or in any way change the obligations of, appellant, the same is invalid, and the respective rights and liabilities of the parties must now be determined by their contractual relations entered into in 1847, in the same way as if the legislation of 1897 had never been enacted. However, as we read the complaint and understand the theory of the State, the late legislation is appealed to only as providing a remedy for enforcing the preëxisting charter obligations of appellant, and to this extent it is valid. *Cincinnati, etc., R. Co.* v. *Clifford,* 113 Ind. 460-466; *Webb* v. *Moore,* 25 Ind. 4; *Hopkins* v. *Jones,* 22 Ind. 310-315.

We pass, then, the legislation of 1897, as being out of the case, except as conferring certain powers upon the Attorney-General, and as defining the procedure whereby the claims asserted by the State, as arising under the original charter, may be fully and fairly contested with appellant. The sections of the charter important in this inquiry are these:

"Section 22. The corporation may charge and receive such tolls and freights for the transportation of persons, commodities, and carriages on said road, or any part thereof, as shall be for the interest of said company, and to charge, lower, or raise at pleasure: Provided, that the rates established from time to time shall be posted in some conspicuous place or places on said road.

"Section 23. That when the aggregate amount of dividends declared shall amount to the full sum invested and ten *per centum* per annum thereon, the legislature may so regulate the tolls and freights that not more than fifteen *per centum* per annum shall be divided on the capital employed, and the surplus profits, if any, after paying the expenses and receiving [reserving] such proportion as may be necessary for future contingencies, shall be paid over to the Treasurer of State, for the use of common schools, but the corporation shall not be compelled by law to reduce the tolls and freights so that a dividend of fifteen *per centum* per annum cannot be made; and it shall be the duty of the corporation to furnish the legislature, if required, with a correct statement of the amount of expenditures and the amount of profits after deducting all expenses; which statement shall be made under the oath of the officer whose duty it shall be to make the same.

"Section 24. Semiannual dividends of so much of the profits as the corporation may deem expedient shall be made on the first Monday in December and July, annually, unless the directors fix on a different day, and pay the stockholders as soon thereafter as they can with convenience, and no dividends shall be made to a greater amount than the net profits after deducting all expenses; and the directors may retain such proportion of the profits as a contingent fund to meet subsequent expenses as they shall deem proper."

"Section 35. The corporation shall cause to be kept a fair record of the whole expense of making and repairing said railroad, and of each section thereof, with all the incidental expenses, and also a fair account of the tolls received; and the State shall have the right to purchase the stock of said company, at any time after twenty-five years, by paying to said corporation a sum of money which, together with the tolls received, shall equal the cost and expenses of said railroad as aforesaid, with an interest of

ten *per centum* per annum; and the books of said company shall always be open for the inspection of any agent of the State, appointed for that purpose by the legislature, and upon any refusal to exhibit their books and accounts to said agent, upon request made to the president, all powers granted by this act shall cease."

Section thirty-five was repealed by the act of February 16, 1848, but we deem it useful here in the interpretation of other sections.

Three important questions arise upon the construction of these sections, and chiefly under section twenty-three: (1) Does said section impose upon appellant any obligation to pay any portion of its net earnings to the State, in the absence of legislation regulating its tolls and freights? (2) What is meant by the term "full sum invested,"—the sum subscribed and paid in by the stockholders, and such of the bondholders as elected to convert their bonds into stock, and thus become stockholders, or the full cost of construction and equipment of appellant's road, without reference to whether the money employed was taken from the surplus earnings of the corporation, or directly contributed by the shareholders? (3) Was an action maintainable by the State for surplus earnings before a demand for an accounting had been made and refused?

I. The first of these questions involves the sufficiency of the complaint. It is averred therein that the legislature never regulated the tolls and freights to be charged by appellant, and the question is, was such regulation required by the charter as a condition precedent to the State's right to the earnings in excess of the amounts specified? It is obvious from the sections quoted that the lawmakers had in mind a scheme which contemplated, not only liberal profits to investors, but, as well, security to the public against extortion, and a contingency in which the common school fund should become entitled to share in the profits of the enterprise. The provisions of these sections may be

better understood by looking at them from the point of view held by the legislators at the time of their enactment. Since the occupation of the territory the people of the State had sorely felt the need of highways as means of inter-communication, and for reaching the markets. At that time perhaps more laws had been passed by the legislature relating to roads than had been passed upon all other sub-jects combined, and to meet the still pressing demand the State in 1836 had undertaken a general system of public improvements which provided for the construction of many highways, including turnpikes, canals, and railroads. This venture on behalf of the State had proved disastrous, and all the work begun thereunder had been abandoned as early as 1842, leaving the State with a prostrate credit, and un-supplied with necessary highways.

Furthermore, popular education had also been a matter of chief concern. In the organization of the State govern-ment in 1816, the people had declared, as a part of their fundamental law, for a public school system in which in-struction should be free and equally open to all. Const., Art. 9, §2. Subsequent legislation in accord with this con-stitutional requirement had given unmistakable promi-nence to the desirability of free schools. Most, if not all, of the financial resources of the State, other than taxation, had been and were being appropriated to the accumulation of a permanent fund for the maintenance of such schools. Here, then, we find the legislature confronted with a popu-lar demand for more highways and a more ample school fund. The State could neither build roads nor appropriate school funds. She had no money and no credit. Private capital must be induced to engage in such enterprises.

Railroads, as freight carriers, were at the time attracting prominent attention. Massachusetts had led in 1826 in the construction of the first railroad in America, the same be-ing a line from Quincy to tidewater, and so rapidly had such roads arisen in favor, that in 1847 there were in suc-

cessful operation more than 5,000 miles of railroad in the Eastern and south Atlantic states. Appleton's Am. Cyc., Vol. 14, 172. Our own State had felt the impulse of railroad building. No less than twenty-five charters for the construction of railroads had been previously granted, but none had proceeded to completion. In 1836 in its great system of internal improvements, the State had provided for the construction of a railroad from Madison to Lafayette, *via* Columbus, Indianapolis, and Crawfordsville, thus opening up to general markets, through the Ohio river, and the Wabash and Erie canal, three populous and fertile sections of the State. The latter work was entered upon, but the State finding that it had undertaken more than it was able to accomplish, in 1843 turned over to a private corporation the incompleted portion between Madison and Indianapolis. The receiving company's president, in February, 1846, reported to his board of directors that the road still lacked thirty miles of reaching Indianapolis. It was probably completed in that year.

So it may be assumed that the legislature of 1847, convening so shortly after the opening of the first railroad in the State, while in a mood to give friendly consideration to the proposals of a body of men to build, with their own money, a railroad through another important section of the State, yet the members were undoubtedly without the necessary *data* as to cost of construction and equipment, expenses of operation, and earnings, of railroads, to enable them to settle upon definite terms and franchises, fair alike to the corporation and the public. There existed reasons, too, why an east and west line across the State from Terre Haute to Richmond should be regarded as the most profitable line in the State for a railroad. The route for the entire distance paralleled the National road, a great thoroughfare previously constructed by the federal government, eighty feet wide from Maryland to the Mississippi river, thus furnishing the rapidly increasing population of the

seaboard a spacious highway into the broad and fertile regions of the West. Along this only way the stream of emigration had flowed for several years. Cities, towns, and populous communities had gathered along its borders. New settlements sought continuity with it. National attention had been drawn to it as the only highway between the East and the West under the fostering care of the national government. The proposed new railroad was thus to run along the channel of direct commerce and communication, as fixed by congress, between the Atlantic and Mississippi valley, and would be the first to enter the open door of the great prairies of Illinois.

At any rate, when the subject came up the legislators were not so swerved by their enthusiasm for railroads as to make reckless concessions to the incorporators; for, liberal as they were required to be, and were, to induce the investment of private means in a novel venture, it is very plain that they had, from present considerations of some character, confidence enough in the ultimate profits of the enterprise to set a limit to the corporation's money-making. The paramount consideration, doubtless, was such a scheme as would attract private capital. Here are some of the inducements held out to investors: (a) The company was to have, at the beginning of business, unrestrained power to charge such rates for the transportation of freights and passengers, as seemed to it to be to the interest of the company, and power to raise and lower such rates at pleasure. §22. Under this power it could have been pointed out that the managers of a railroad, susceptible of easy and inexpensive construction, linking the West to the East, tracing the thickly inhabited border of the National road, touching at the State's capital, could unquestionably so adjust its tariffs as to meet the requirements of a satisfactory investment. (b) In effect the State proposed to suspend the exercise of its sovereignty, and allow the company to continue uncontrolled and uncontrollable in its exactions from

the people, until the investors had received back as dividends the full sum invested, and ten per cent. per annum thereon, and thereafter to continue in perpetuity to charge and collect such tolls as would net them two and one-half times the legal rate of interest.  (c) The State guaranteed that the company should enjoy in perpetuity the right to charge such tolls as it liked, upon failure of the builders to receive back as dividends the full sum invested and ten per cent. thereon, and, if at the end of twenty-five years (§35) the State elected to purchase the road, it could do so only by paying the stockholders the full *cost* of the road and ten per cent. thereon.  (d) The State should never, even after the builders had been fully reimbursed, interfere in the matter of charges so as to reduce the profits of the stockholders below fifteen per cent. per annum.

The legislature was not free to do as it would.  It had to do the best it could.  The State's effort at making public improvements had irretrievably failed.  Private capital must be enlisted, or the people do without railroads.  The best offer to make was one that would promise investors the speediest and surest return of their money, and, to that end, give them the most absolute control of the means by which the money was to be made.  That accomplished, other interests might then be protected.  So it was provided (§23) that when the stockholders had been reimbursed, and had received back all they had put in, and ten per cent. per annum thereon, and still retain their shares, the State should then become entitled to resume its sovereignty, and the cherished school fund afforded a chance for enlargement.  The language is that when the money invested, and interest, has been fully returned "the legislature may so regulate the tolls and freights that not more than fifteen *per centum* per annum shall be divided on the capital employed, and the surplus profits, if any, after paying the expenses and receiving [reserving] such proportion as may be necessary for future contingencies, shall be paid

over to the Treasurer of State, for the use of common schools, but the corporation shall not be compelled by law to reduce the tolls and freights so that a dividend of fifteen *per centum* per annum cannot be made."

The situation of the legislature was unique. The fiscal depression that followed the collapse of the State's recent undertakings had not been restored. The people were clamoring for better ways for reaching the markets. The expenses and earnings of a railroad were problematical. How generally the people would patronize the road was only conjectural. The profits might be small or very large. One seemed as probable as the other, and when the inducements had been made sufficiently strong to assure the investment of private capital on the basis of small profits, then, on the basis of possible large profits, there arose the twofold duty of protecting the people from continued wrong and oppression, and to secure for the State something valuable for the large franchises granted. Reasonable capitalists would not hesitate to accede to such terms when it was provided that they should operate only after the investors had received back all their investments, with interest largely in excess of the legal rate. With these various interests, objects, and purposes in view the plan outlined in section twenty-three was adopted.

At least three reasons appear for believing that the intention was that the stockholders should not, after becoming reimbursed for their outlay, at any time or under any conditions, have more of the net earnings than fifteen per cent. per annum of the sum invested: (1) The irrevocable right to fifteen per cent., expressly conferred, negatives a right to more. (2) The faithful account of construction, of expenses and receipts, required by sections twenty-three and thirty-five, and the mandatory language employed in disposing of "the surplus" implies the contemplated existence of a substantial balance. It seems entirely improbable that the legislature intended the mockery of pro-

viding for the payment to the school fund of the fraction remaining after that body had adjusted the tariffs of the company, so that the net earnings should be just fifteen per cent. of the shareholders' investments,—no more and no less.    (3) It is clear that the lawmakers considered that under their liberal grant the time might come when the corporation would be receiving larger profits than were just, and when that time arrived, if ever, any earnings in excess of fairness should be relinquished by it.    The limitation that entered into this consideration is stated as affecting the periods both before and after full reimbursement of the builders, and it seems incredible that the legislators should deem it expedient to declare their sense of what was just and fair to the shareholders and State, dispose of the excess over the limit fixed by them, and then provide, or leave for construction, that the company's right to the unjust excess should accrue by legislative inaction on the subject of regulating its tolls

But it is argued that the statute required the legislature to regulate the tolls and freights of the company, as a condition precedent to the State's right to the earnings in excess of fifteen per cent.; and in support of the contention it is insisted that "may so regulate," as used in section twenty-three, should be read, "shall so regulate."    We are unable to accept the argument as sound.    If "may" should be construed as mandatory, when shall the legislature begin to act?    The statute says "when the aggregate amount of dividends declared shall amount to the full sum invested and ten *per centum* per annum thereon" shall be the time when the legislature may begin regulating the tolls.    It is certain, however, that conditions might be such at that time, and ever after, for that matter, that the legislature would have no power to act.    The stockholders might have reached reimbursement by earnings less than fifteen per cent. per annum, and the time might never come when they earned so much as fifteen per cent. per annum, and hence the

power to regulate, declared to exist, would be, and might ever continue to be, without the right of exercise, and therefore a nullity, for it is expressly provided in the same section "that the corporation shall not be compelled by law to reduce the tolls and freights so that a dividend of fifteen *per centum* per annum can not be made." The legislature will not knowingly command a thing to be done that is impossible of accomplishment, nor will it wittingly command a thing to be done that ought not to be done.

Perchance it might happen when the time came that the stockholders had received back their full investment, and were continuing to receive more than fifteen per cent. per annum, that the State ought not to change the established and prevailing rates of the company. It should be borne in mind that the right to regulate was primarily intended for the protection of the people. All the protection the people were entitled to was fair rates, as compared with the rates elsewhere charged on other roads over the country. The railroad company might find from experience that the friendship of the communities traversed was valuable, and that the interest of the company lay in such fair rates as would invite business and stimulate trade. So when the legislature became entitled to interfere it might find a schedule of rates in force by the company that was perfectly fair and perfectly satisfactory. In such case will it be said that it was meant that the legislature should change it?

Then, again, as we have seen, the proposed road would occupy a route of exceptional advantages for business,—advantages apparently so favorable that a schedule of charges, fair and necessary on other railroads in the State, might, upon this, prove sufficient to produce an income in excess of fifteen per cent. In such case was it intended to make it the duty of a subsequent legislature to reduce the rates of the company to the lowest point at which fifteen per cent. could be made? It is the duty of the State to treat its citi-

zens alike, and to see that others who exercise public powers do the same. So when the State should undertake to regulate the tariffs of its railroads, it must make such tariffs uniform. It could not require the people between Indianapolis and Terre Haute to pay one mileage rate, and the people between Indianapolis and Madison to pay another. If the legislature should find such facts existing with respect to rates, when the State regained its power of supervision, there would exist not only no duty to change the rates it found in force, but it would be wrongful to change them. Will it do to believe that it was meant by the legislature, in the adoption of appellant's charter, or so understood by the incorporators at the time of its acceptance, that, if it should turn out that fair rates formulated and established by the company should produce more net profits than fifteen per cent. of the investment, the State must go through with the form of adopting and enacting into law the same fair rates, to acquire a right to the surplus? The intent of the law is the law.

The reasonable and true interpretation of the provisions under review seem to be: (1) That the matter of regulating the tolls and freights of appellant, at any permissible time, rested solely in legislative discretion; (2) the incorporators were absolutely limited in the profits of the enterprise, to the full sum invested, and ten per cent. per annum thereon, and thereafter to an annual dividend of fifteen per cent. upon the capital employed; (3) when the stockholders had received the limit, the surplus, if any, remaining after the payment of expenses, and reserving such an amount as shall be necessary for future contingencies, should be paid over to the Treasurer of State for the use of the common schools, without reference to whether the legislature had, or not, previously regulated the tolls and freights of the company. "A doubtful charter does not exist; because whatever is doubtful is decisively certain

against the corporation." *Commonwealth* v. *Erie, etc., R. Co.,* 27 Pa. St. 339, 351, 67 Am. Dec. 471; *Holyoke Co.* v. *Lyman,* 82 U. S. 500, 511, 21 L. Ed. 133; *Covington, etc., Co.* v. *Sanford,* 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; *Stourbridge Canal Co.* v. *Wheeley,* 2 Barn. & Ad. 792; Thompson, Corp., §5661.

II.  A spirited controversy prevails upon what is meant by "the full sum invested" and "capital employed" as used in section twenty-three.  The State's insistence is that the term embraces only such sums as were contributed directly by those who purchased the corporation stock for the construction of the road, and the sum paid for bonds that were issued and used for construction, and subsequently converted, under their provisions, into shares of stock, amounting in the aggregate to $1,216,690.  On the other hand, appellant insists that the term means the full *cost* of the construction and equipment of the road, whether contributed directly by the stockholders or taken from the earnings of the road, amounting in the aggregate to $1,988,150. If the State's contention is right, there was received and appropriated by appellant, in excess of the amounts to which it was entitled under its charter, a large sum of money; and if appellant's contention is right, it received no more money than it was entitled to retain.  In the solution of this question we should again turn to 1847 and consult the history of the time.  We should find that modern methods of railroad promotion and construction were unknown at that period.  It was then understood that the only way to get a railroad was for those desiring it to get together the money and build it, as they would buy a farm. Bonds predicated on future values and incomes, and construction companies distinct from the principal corporation, were unknown attributes of railroad construction.

It is clear that the General Assembly assumed that the entire cost of construction should be subscribed and furnished by the stockholders, except such sums as might be

received as gifts and donations.   The act fixes the capital stock at $800,000, and prescribes the manner in which it should be subscribed and paid.   It authorizes county commissioners of counties traversed by the road to subscribe for their county such an amount of stock as they would deem proper.   §26.   If the capital granted should prove inadequate to accomplish the work intended, the corporation might increase it.   §31.   If the directors contracted debts over and above the amount of good and solvent stock subscribed, they should be personally liable for the excess.   §36. The work should commence within five years after the opening of the books, and should proceed towards the point of destination as might be within the ability and for the interest of the company, and should be completed within fifteen years.   "Provided, also, if any part of said road shall be completed within the time aforesaid, in that case all the rights, privileges and benefits granted in this act shall be extended to and vested in said company to such part of said road as shall be completed."   §19.   The act did not originally authorize the company to issue bonds or mortgage its property for any purpose, but such power was subsequently conferred by amendment.   Local Laws 1851, p. 28.   The company was empowered to receive by donations, gifts, grants, or bequests, land, money, labor, property, stone, gravel, or other materials.   §14.   The improvement was to be made by the coöperation of interested parties along the line,—counties as well as individuals, who, for the money they put in, should have a certificate as evidence of the amount of their contributions.   If persons along any part of the line, more liberal or more able than others, should succeed in completing that portion of the road, the full rights and benefits of the charter should apply to the completed portion, the same as to the entire line if completed.   The thing in mind was to get the road completed as far as possible, and to make certain the security for the money put in to carry forward the improvement to that

point of completion when it would serve the purpose of its construction. Profits or surplus earnings of an enterprise, so difficult of attainment as the road was supposed to be, could hardly have been reckoned upon as "money invested" or as "capital employed." The purpose was to provide the best possible security to capital that chanced the success of the venture, and not to remunerate capital that was earned after the success of the venture had become assured. It was the money put in, that made profits and dividends possible, that was to receive the special favor of the law, and be returned with ten per cent. per annum. In popular sense, "the full sum invested" and "capital employed," which are clearly used here as synonymous terms, usually means an original sum placed upon a venture with a view to profits or an income. If one has $1,000 and with it purchases railroad or other stocks, it will be said that he has invested $1,000. He has also acquired rights in the corporation other than a claim for money. He, to the extent of his investment, has become a part of the corporation, and a joint owner of its assets. If he receives and uses the annual profits of his stock, or if there are none, his investment is still $1,000. If he permits the annual profits or accretions to remain and accumulate with the company, in whole or in part, the investment remains $1,000. It can make no difference in the *status* of the profits whether he uses them himself, or allows the company to use them.

The money that was to be restored as "the full sum invested" was to be returned as "dividends declared" by the corporation. Dividends are declarable and payable only to stockholders; hence the only returnable money contemplated was that going to stockholders, and, we must assume, only to such stockholders as the legislature had in mind as contributors to the capital required in the first construction of the road. It was believed then that the capital required for the building and equipment of the road for practical use as a railroad, as they were then being constructed

and operated, was the limit of capitalization. Such capital was the only money that would be subjected to any special hazard, or would deserve any special safeguarding, and there is apparent not the shadow of a reason why the lawmakers should grant any special favoritism to surplus earnings of the road, subsequently expended by the corporation in permanent improvements and extensions.

We find further evidence that the legislature did not use "full sum invested" and "cost of the road" as equivalent terms. In section thirty-five it is provided that if, after twenty-five years, the State shall elect to purchase the road, there shall be paid to the stockholders, not the full sum invested or capital employed, but a sum equal to the *cost* and expenses of said railroad with an interest of ten per cent. per annum..

The aggregate amount of stock issued by appellant, and which, it insists, represents the cost of construction and the full sum invested, is $1,988,150. Of this amount appellee disputes, as properly belonging to the full sum invested, within the meaning of section twenty-three, the following items:

| | |
|---|---|
| Stock dividend November, 1856.....$211,600 | 00 |
| Stock dividend April, 1864......... 376,700 | 00 |
| Stock issued on account of bonds paid. 50,000 | 00 |
| Stock issued on account of bonds lost.. 5,000 | 00 |
| Stock donated to Chancey Rose...... 6,000 | 00 |
| Stock donated to John Rose......... 10,000 | 00 |
| Interest and discount included in stock 112,159 | 95 |
| Total ......................$771,459 | 95 |

In the annual report of the president of the road filed January 17, 1853, appears the following statement: "The road is amply equipped for the present, but will have to be increased in the coming season to enable us to meet the anticipated increase of business."

It thus appears that the road was in successful operation, and amply equipped for current business, four years before the first stock dividend was issued; hence no part of such stock could have represented an investment of the stockholders for construction. While the company had the right to appropriate from the earnings all necessary and proper operating expenses, including ordinary improvements, replacements, and repairs, whatever amount was earned in excess of such expenses, was pledged to the liquidation of the sum invested, and ten per cent. thereon, and as against the State no part of such expenses could be capitalized. It was never contemplated that earnings, in any form, should become a part of the full sum invested, in the sense that they should be returned with ten per cent. interest, and thereafter be entitled to fifteen per cent. annual dividends. Such reasoning leads to an absurdity.

There is less foundation for the stock dividend of 1864. The record shows that no charge was made to construction account during the eight years from 1856 to 1864, and hence the stock dividend of the latter date was simply a capitalization of the expense account that had been paid from the earnings. Will it be said that this should be done, as against the State? If it should, when will the time come, and what shall the earnings be, to accomplish a return of the capital and ten per cent. interest? It is certain that if the sums expended for betterments and improvements are to be considered, the construction of the road would never be completed, for the necessity for such things grow out of the operation of the road and will continue to arise as long as the road is operated.

The bond transactions have no greater merit. It appears that the company, in the ordinary course of business, had from its earnings paid off $50,000 of its outstanding bonds, which had not been surrendered for stock, as they might have been. When the company had paid its own debt with its own money, that was the end of the matter. The trans-

action was an operating expense, and entitled to no other *status.* The issuing of the stock for the lost bonds was of the same general character. Ten thousand dollars in stock was issued to John Rose for services, "for which he makes no charge," and $6,000 to Chancey Rose, on some unstated account, which, if a legitimate allowance, was also an operating expense, and should not be counted in estimating the amount to be returned to stockholders.

It appears that interest was allowed to subscribers to the capital stock upon all payments made in advance of the time when payments could have been called for by the directors. The stock was sold for less than its face value. Bonds were also sold at a discount. Certificates of stock were issued to subscribers without deducting the interest and discount allowed, and to the bondholders, upon the converting of their holdings into stock, for the full face value of their bonds, without deducting the discount received, aggregating the sum of $112,159.95. This interest and discount was not capital invested in the improvement. It represented a sum that never in any way entered into the construction of the road, or into the assets of the corporation. It was an expense representing the cost of procuring the money for construction, — nothing more nor less. These sums deducted leaves the capital stock, which rightfully represents the full sum invested in the construction of the road, at $1,216,690. See *Mobile, etc., R. Co.* v. *Tennessee,* 153 U. S. 486, 496, 14 Sup. Ct. 968, 38 L. Ed. 793; *State* v. *Manchester, etc., R. Co.* (N. H.), 48 Atl. 1103.

III. It is set up in the third paragraph of answer that on the 28th day of May, 1875, the plaintiff herein instituted a suit against this defendant, in the superior court of Marion county for the recovery of money; that the defendant appeared, and on the 8th day of June, 1875, filed its demurrer to the complaint therein; that on the 6th day of March, 1876, the demurrer was sustained, and thereupon the plaintiff, failing and refusing to amend, elected

to stand by its complaint, and final judgment was thereupon rendered in the defendant's favor, May 9, 1876; that the judgment thus rendered was, by the plaintiff, appealed to, and affirmed by, the Supreme Court; that the matters adjudicated in said cause were and are the same identical matters sued for in this action. The pleadings disclose that the complaint in the Marion Superior Court contained no averment of conversion, or a previous demand upon the defendant for an accounting as to its earnings under the provisions of section twenty-three of its charter. It is insisted that for this omission the complaint in the former action was essentially bad, and hence there could be, and was, no adjudication upon it.

It is undoubtedly the general rule that, in ordinary obligations to pay money, it is the duty of the obligor, within the time for performance, to hunt his creditors up and pay or tender the sum owing, without a request or demand so to do, if he would escape costs of suit. But there are a great many cases, which, if not exceptions to the rule, are at least not governed by it, wherein, if money alone is due and owing to another, and the amount thereof definitely known, or ascertainable from facts within the knowledge of the obligor, it is essentially necessary to make a demand before an action can be maintained. Some of these cases follow. Generally, persons who come rightfully into the possession of funds in trust for others, are entitled to a request, —as agents, trustees, and bailees. *Armstrong* v. *Smith,* 3 Blackf. 251. Attorneys at law, for money collected by them. *Black* v. *Hersch,* 18 Ind. 342, 81 Am. Dec. 362. For the recovery of bank deposits. *Bank, etc.,* v. *Merchants, etc., Bank,* 91 N. Y. 106; *Brahm* v. *Adkins,* 77 Ill. 263. For the recovery of dividends declared by corporations. 2 Morse, Banks and Banking (4th ed.), §708; *Hagar* v. *Union Nat. Bank,* 63 Me. 509; *Scott* v. *Central R. etc., Co.,* 52 Barb. 45. Where one makes a contract with another to pay the debts of the latter, before an action can

be maintained against the former by a creditor a demand of payment is necessary. *Durham* v. *Bischof*, 47 Ind. 211. Where a general agreement is made to share future expenses, which are indefinite, no action will lie in favor of either party against the other until they have accounted, or until the account has been presented and its adjustment demanded. *Hayes* v. *Morrison*, 38 N. H. 90.

These are instances enough to show that the general rule is properly confined to narrow limits, and that a great mass of cases rest upon their own particular facts. It may be said that a demand is necessary in all cases where, from the peculiar nature of the transaction, the party to be charged may reasonably expect it, not from the known, or reputed forbearance of the promisee, but from facts that exist in the case, which naturally and usually influence persons in like situations to give notice. As an agent, attorney, bailee, or trustee, having had the right of possession conferred by another, may reasonably expect to continue in possession until its surrender has been requested by the party conferring or entitled to it. A banker, to avoid damage from unnecessary annoyance and costs, is entitled, from general custom, to a request to pay, before an action will lie against him for a deposit. So a corporation that has declared a dividend of profits among its stockholders cannot be sued until it has been requested and given a fair opportunity to pay without suit. All these and other like cases are grounded upon the principle that the obligor is ready and willing to perform at the convenience and pleasure of the obligee, whenever that pleasure is signified, and that fairness and good conscience require notice before legal proceedings shall be begun.

"There is, indeed, respectable authority," says Blackford, J., in *Sheets* v. *Andrews*, 2 Blackf. 274, "for the opinion, that it would have been better, had the law required a demand previously to a suit, even in cases where money only had been contracted for;" and that eminent

jurist declares that the policy of the law in dispensing with a demand, where money only was promised, having been thus questioned, should be accepted as strong ground to show that the rule excusing a demand upon the obligor for performance, should be applied with great caution in all other cases.

There was something more in this case than a simple obligation and promise to pay money. As a condition precedent to any duty to pay or account for money received, certain collateral things were to be done that could be accomplished only by the coöperation of both parties to the contract. . The railroad was to be built, money must be earned, expenses paid, repairs and ordinary improvements made, the sums contributed by the builders for construction and equipment must be restored, a sufficient sum to meet future contingencies reserved, and a fifteen per cent. current dividend provided. All the money the company should receive in the operation of its road from the beginning should be its property,—much or little. The right of the State at no time attached to any part of the earnings until after the company had paid its operating expenses, refunded the investment, set apart a sum for future contingencies, and provided a fifteen per cent. dividend on its proper capitalization. When these things were all done, if surplus profits remained, the duty of the company then arose to pay such surplus, as a surplus, to the Treasurer of State. But how was it to be known when these things were accomplished, and when liability to the State arose, without some basis or rule established or agreed to by the parties for making the estimate? Will it be seriously contended that the General Assembly conferred upon the corporation power arbitrarily to settle for itself and for the State what should constitute the "full sum invested?" What operating expenses, and what a reasonable sum for future contingencies? If it did, in the doing of it, it must have known that it was sheer folly to provide for the payment of a sur-

plus to the State.   To hold that it was given over to the company conclusively to resolve, as against the State, after the road was put in operation, that all betterments, extensions, and extraordinary improvements paid for from the earnings, and bonded indebtedness incurred for construction, but paid from the profits, and divers other items, that represented not a dollar used in the construction of the road, may be, at the pleasure of the company, capitalized, counted, and refunded, as a part of the "full sum invested" within the meaning of section twenty-three, is equivalent to holding that it was the legislative intent to place it wholly within the power of the corporation to defeat the State's right by avoiding the accumulation of a surplus.

The facts of this case illustrate the absurdities to which such a construction of the statute will lead.   As we have heretofore seen, the company used in the construction of the road, ready for business, subscriptions to its capital stock and the proceeds of negotiated bonds afterwards converted into stock by the holders, the sum of $1,216,690, which sum was the investment meant by section twenty-three as entitled to reimbursement, and upon which a fifteen per cent. dividend should thereafter be paid.   The road was opened for business in the autumn of 1851.   The company commenced declaring and paying dividends in 1852, and, in the words of appellant's counsel, "continued from that time until this investigation closed, in 1873, to pay semi-annual dividends every year of its existence in large amounts,—ten per cent. additional, and extra ten per cent. additional, and extra seven and eight per cent."   For obvious reasons, arising while the road was pursuing its extraordinary career, the capital stock was increased by dividing among the shareholders as stock dividends, in 1856, $211,600; in 1864, $376,700, and by issues on divers other accounts, heretofore set forth in a table, amounting in all to $771,460, predicated upon a disbursement of profits and replacements, betterments, and extensions, five and thir-

teen years, respectively, after the road began business, thus making the total issue of stock $1,988,150, and which is now claimed by appellant to be the "full sum invested," and which must be returned, and receive a fifteen per cent. dividend, before the State becomes entitled to anything. If this claim is to be allowed, the stockholders' investment may be enlarged, by a like process, as often and whenever the exigency of absorbing increased profits arise, and thus effectually prevent a recovery by the State.

It is clear that the legislature never intended that the corporation should have its own way with respect to what should constitute "the full sum invested," what proper operating expenses, and other fit matters of accounting; for the right to require an accounting, which implies the right to have it made on a fair and just basis, is expressly reserved. And while these grounds of settlement remained unadjusted and in controversy, and the initiative rested upon the State, and the question of whether the company owed the school fund remained problematical, and depended solely upon the rules that should prevail in the settlement, no duty rested upon the corporation to pay any sum to the Treasurer of State, and no right of action rested in the State for the recovery of money, with or without a demand. The duty to account when required, as imposed by section twenty-three, means nothing more nor less than the duty to settle, and pay over to the Treasurer of State, any surplus disclosed, when requested or demanded by the legislature to do so.

It is probable that the right of the Attorney-General or the Treasurer of State to demand an accounting would have been implied if the law had been silent. But there is no basis for an inference here. A specific provision for an accounting, and to whom it shall be made, having been written in the law, no other can be implied. A public officer is a creature of the statute, and has no power but that expressly conferred, and necessarily implied, to enable him

to carry out some specific duty, and if at any time down to 1847 the Attorney-General, Treasurer, or other officer of State, had attempted to settle, and give a quittance to appellant, the act would have been void, and would have concluded no one. *McCaslin* v. *State, ex rel.,* 99 Ind. 428, 439; *Platter* v. *Board, etc.,* 103 Ind. 360-378; *State* v. *Portsmouth Sav. Bank,* 106 Ind. 435-451.

We therefore conclude that no suit for money would properly lie against appellant without an accounting and disclosure of something due; that no duty was imposed upon appellant to make an accounting until requested by the General Assembly. This request was not made until 1897, and no actionable default by appellant had occurred prior to that date.

(a) The former complaint was insufficient for another reason. Said complaint was in three paragraphs. The third, being for the recovery of money wrongfully paid the company by the State for the transportation of troops and munitions of war, in violation of its charter (§30), need not be noticed. In the first paragraph it is alleged that the company's charter was passed January 26, 1847; that the company accepted and organized under the charter, but it is not averred when. The total amount invested by the company "was and is" $1,300,000, but it is not stated when the investment became that sum. The company accepted the general railroad law January 17, 1873. The total amount of net earnings of the road from the beginning had been $8,000,000, but it is not shown, outside of an exhibit filed with the complaint, how much of the earnings was received before January 17, 1873. The exhibit purports to show only the gross net yearly earnings. To have recourse to it, in support of the complaint, we must find that the exhibit is the foundation of the action; and surely we can not do this. Standing alone the exhibit does not even tend to show a right of action in the plaintiff. The action was not upon an account, nor to recover net earnings,

but clearly its foundation was the agreements and covenants found in the charter. *State, ex rel.,* v. *Helms,* 136 Ind. 122; *Fuller* v. *Cox,* 135 Ind. 46; *Price* v. *Bayless,* 131 Ind. 437.

These indefinite averments tested by the rule that they must be construed most strongly against the pleader, and we have a case showing that sometime between 1847 and the filing of the complaint, May, 1875, the capital invested amounted to...................... $1,300,000

As we are not informed when it was, we will assume that it was the midway period between 1847 and 1873, or July 1, 1860. Before the State became entitled, there must be returned, not only the principal sum invested, but ten per cent. per annum thereon for twelve and one-half years, to wit:...................... 1,625,000

And also fifteen per cent. per annum for the last half of the period.................... 2,437,500

Total ..........................   $5,362,500

We are uninformed how much net earnings was received before the company gave up its special charter in January, 1873, except as we may infer from the amount of net earnings shown to have been expended as follows:

| | |
|---|---:|
| Invested in various bonds and stocks......... | $3,000,000 |
| Surplus fund ......................... | 2,000,000 |
| Bonds converted into stocks.............. | 50,000 |
| Bonds lost, and stock issued therefor....... | 5,000 |
| Total .......................... | $5,055,000 |

Which sum is $307,500 less than the company was entitled to receive before the State's claim would attach.

The second paragraph, by an application of the same rule of construction, shows equally plain that nothing was then recoverable by the State. It was not shown in this para-

graph that the company had ever accepted the general law, and hence we must assume that it was still operating under its original charter. Like the first, it alleges that the charter was granted in 1847, and was accepted; but, no time being stated, we will assume that its acceptance was also in 1847. It is alleged that the full sum invested in construction and equipment was $1,344,000, and beyond an averment that it amounted to that sum in 1867, and has since then continued that sum, the paragraph is silent as to when that sum was reached; and we are again at liberty to assume that it was all furnished in 1847, when the charter was accepted. Still further like the first, there is no averment of how much had been the net earnings of the company, except so far as it may be presumed from the allegation that the company had, of the net earnings appropriated and invested in bonds and in its own and other railroad stocks, and retained, over necessary contingent expenses, the total sum, of various items set forth, $5,855,702.

Being without information from the complaint as to when the net earnings were sufficient to pay the full sum invested, and ten per cent. per annum thereon, we are again free to assume that the road began earning money in 1848, and that its aggregate net earnings had reached a sum equal to the capital invested, and ten per cent. thereon, by the middle period between 1848 and 1875,—when the complaint was filed,—thirteen and one-half years, and then the account stands thus:

Capital invested .....................  $1,344,000
Ten per cent. on the capital for thirteen and
    one-half years .....................  1,814,400
Fifteen per cent. dividends on the capital for
    the last thirteen and one-half years......  2,721,600

Total amount to which the company was en-
    titled before the State's claim attached...  $5,880,000

Terre Haute, etc., R. Co. *v.* State, *ex rel.*

Which shows that when the former suit was commenced the company lacked $24,298 of receiving the amount of profits it was authorized to retain.

Thus we have seen that the complaint of the Attorney-General filed in the Marion Superior Court in May, 1875, failed to exhibit a cause of action, for two reasons. Appellant's demurrer to the complaint in said former suit, for insufficient facts, was sustained, and judgment was rendered on the complaint against the State.

(b) Upon this state of facts the further contention arises, was the judgment thus rendered upon a bad complaint, conclusive, or susceptible of being made conclusive by extrinsic evidence? It is the law everywhere that whenever a matter is adjudicated and finally determined by a competent tribunal it is considered as forever at rest. It may also be said to be a well established rule that a judgment for the defendant, on demurrer to the complaint, by reason of the omission of an essential allegation therein will not bar a subsequent suit upon a complaint in which the omitted allegation is supplied. *Stevens* v. *Dunbar,* 1 Blackf. 56; *Estep* v. *Larsh,* 21 Ind. 190; *Griffin* v. *Wallace,* 66 Ind. 410-417; *Gould* v. *Evansville, etc., R. Co.,* 91 U. S. 526, 23 L. Ed. 416; *Russell* v. *Place,* 94 U. S. 606, 24 L. Ed. 214; *Terry* v. *Hammonds,* 47 Cal. 32; *Tracy* v. *Merrill,* 103 Mass. 280; *Gerrish* v. *Pratt,* 6 Minn. 53; *Carmony* v. *Hoober,* 5 Pa. St. 305; *Rodman* v. *Mich. Cent. R. Co.,* 59 Mich. 395, 26 N. W. 651; *Birch* v. *Funk,* 2 Met. (Ky.) 544; *Florida, etc., R. Co.* v. *Brown,* 23 Fla. 104, 120, 1 South. 512; *Moore* v. *Dunn,* 41 Ohio St. 62; *Keater* v. *Hock,* 16 Iowa 23; *Wells* v. *Moore,* 49 Mo. 229.

Upon the same principle a judgment against a plaintiff because his action is prematurely brought is no bar to a suit subsequently brought after the cause of action has properly accrued. *Griffin* v. *Wallace, supra; Roberts* v. *Norris,* 67 Ind. 386, 392; *Indianapolis, etc., R. Co.* v. *Clark,* 21 Ind. 150; *Chicago, etc., R. Co.* v. *State, ex rel.,*

153 Ind. 134; *Brackett* v. *People, ex rel.,* 115 Ill. 29, 3 N. E. 723; *Seaton* v. *Hixon,* 35 Kan. 663, 12 Pac. 22; *Wood* v. *Faut,* 55 Mich. 185, 20 N. W. 897.

(c)   It is, however, very earnestly contended by counsel for appellant that if the superior court gave judgment upon the merits of the case, even if the complaint was deficient, the law and the facts entering into such judgment, can not be further called in question, and that since the record is silent as to the grounds of the judgment, the court below erred in refusing to admit in evidence the written opinion of the judges who sat in the case, to show that the judgment was, in fact, upon the merits, and not upon the form of the complaint. We concede that a judgment for the defendant on demurrer to a complaint that has been well brought, whether it involves pure questions of law, or both law and fact, the general effect is to conclude the parties thereby. And when such a judgment may rest upon more than one theory, or upon more than one class of facts, extraneous evidence—even of what the judge said in pronouncing the same—may be properly allowed, to show to what extent and upon what particular subjects the adjudication should operate.   But it is illogical to say that there may be an adjudication of the merits upon a complaint that fails, for want of form or substance, to state any merits, for there can be no merits where there exists no cause of action.

As said in *Moore* v. *Dunn, supra,* at page 64, "A judgment for a defendant on demurrer to a petition which does not state a cause of action determines nothing, only that the facts alleged were not sufficient to constitute a cause of action.   The determination, therefore, did not reach the merits of the case, and did not conclude the plaintiff in a future action in which sufficient facts were alleged." "Such a judgment," says the learned judge in summing up in *Rodman* v. *Michigan Cent. R. Co.,* 59 Mich. 395, 26 N. W. 651, "is not a bar to a second suit founded upon the same transaction, if the new declaration states a cause of action.

The merits of plaintiff's case can not be said to have been adjudicated when his declaration fails to state a case, or any merits." The doctrine of these cases is especially applicable to suits brought before the right of action has matured. It is too much to say there can be an adjudication of a claim before it has accrued, or become actionable, and while there remains something to be done by the plaintiff to consummate his right to sue; and as a general rule, supported by sound reason, and as in harmony with the great mass of decided cases relating to the conclusiveness of judgments, it may be affirmed that where an action is prematurely brought, because the plaintiff has not done all incumbent upon him to do to put himself in a position legally to call upon the defendant to perform his contract, a judgment against the plaintiff in such action will not bar a subsequent action after full performance by the plaintiff, and the same duly alleged.

That is this case. When the Attorney-General commenced the suit in 1875, the State had no right of action against appellant, and whether it ever did have a right to sue depended upon the refusal of appellant to account when requested to do so by the legislature. The judgment of the court in sustaining the demurrer to the complaint in that case was clearly right, and the process of reasoning by which the right result was reached is wholly immaterial. *State, ex rel.,* v. *Hyde,* 129 Ind. 296, 306, 13 L. R. A. 79; *Burke* v. *Table Mountain, etc., Co.,* 12 Cal. 403, 408. Besides there might have been, in the opinion of the court, more than one reason why the plaintiff should fail, and it was content in the expression of one. There is nothing in the record to indicate that the court adjudged the action as timely brought.

(2) The fact that the action in the Marion Superior Court was the result of an agreement by the State and appellant to submit the question of appellant's liability to that court, makes no difference. The agreement was to submit

the validity of the State's claim upon the facts as they existed at the time, not as they would be after more profits were received, and after a demand for an accounting had been refused.   The evidence rejected was, therefore, not material, and if admitted would not have benefited the appellant.   Hence its exclusion was not harmful.

(3)   The second paragraph of answer pleads an amendment of appellant's charter in 1851 (Local Laws 1851, p. 80), and appellant's acceptance in 1873 of the general railroad law of 1852, in bar of the State's right to recover. The chief argument being that the effect of the amendatory act of 1851 was to annul the old corporation and create two new ones,—one to build the western, and the other the eastern, part of the road,—without renewal of the obligations imposed by sections twenty-two and twenty-three of the old charter.   Appellant's original charter authorized the construction of a railroad from the western line of the State, through Indianapolis to Richmond in Wayne county.   The amendments of 1851, relied upon, recites that upon the solicitation of the president and directors of the Terre Haute & Richmond Railroad Company, it is enacted that said railroad be and the same is hereby terminated at Indianapolis, and the said president and directors of said road are hereby released and discharged from the construction of any part of said road east of Indianapolis.

By the same act another corporation was created, styled the Indiana Central Railway Company, with authority for the stockholders to meet and elect directors who shall organize a board, and elect similar officers to the Terre Haute & Indianapolis Railroad Company, and who shall take the same oath, possess the same power, and discharge the same duties with the directors and officers of the Terre Haute & Richmond Railroad Company.   And said new company is authorized to construct a railroad, in the general direction of the National road, from Indianapolis to the east line of the State, "and shall possess the same rights, privi-

leges and immunities, and be subject to the same restrictions and liabilities, as said Terre Haute & Richmond Railroad Company;" and the said act, and all its amendments incorporating the Terre Haute & Richmond Railroad Company, are declared to be also the charter of the Indiana Central Railway Company, as far as applicable.

There is not a suggestion anywhere in the amendatory act, that appellant was to be relieved of any of its duties and obligations, beyond the construction of the eastern portion of the originally proposed railroad; nor is there a suggestion anywhere that the old corporation of 1847 was to be dissolved, and two new ones organized,—one to construct the western, and the other the eastern, portion of the contemplated road. To the contrary, the conferring upon the Indiana Central Railway Company, the same rights, privileges, and immunities, and the same restrictions and liabilities as were then possessed and resting upon the Terre Haute & Richmond Railroad Company, gives rise to the clearest inference that the old company was to continue possessed of all its original charter rights and obligations, the same as if it had not given up the building of a part of the proposed road. The amendment shows upon its face that appellant wished a riddance of building the eastern portion, and made of the General Assembly a request to that effect; and it is a strange law that would turn the solicited favor into a discharge from onerous duty, by implication. The acceptance in 1873 of the general railroad law of 1852 had no effect in relieving appellant from unperformed duties, assumed in its charter contract of 1847. The demurrer to the second paragraph of answer was properly sustained.

(4) It is set up in paragraphs five, six, and seven of the answer that the plaintiff's cause of action accrued more than six, fifteen, and twenty years, respectively, *"prior to the commencement of this suit;"* and in paragraph eight, that, so far as the complaint sought to recover money

claimed to be due prior to 1866, the cause of action accrued more than fifteen years before the 19th day of September, 1881. Paragraph nine averred that as to all claim for money due before September 19, 1861, the cause of action had accrued more than twenty years before September 19, 1881; and paragraph ten that the cause of action accrued more than six years before September 19, 1881. The demurrer was sustained to the fifth, sixth, seventh, eighth, and tenth answers, and overruled as to the ninth.

By the statutes of 1852 (2 R. S. 1852, p. 78, §224), it was provided that "Limitation of actions shall bar the State of Indiana * * * as other persons." This section was in force till the taking effect of the revision of 1881, on the 19th day of September, 1881, which provided (§304 R. S. 1881), that "Limitations of actions shall not bar the State of Indiana except as to sureties." The chief debate upon these answers is as to whether appellant's charter shall be held to be a contract in writing, or as resting in parol. If a contract in writing, an action upon it will be barred which had been running twenty years (2 R. S. 1852, p. 76, §211, clause 5), next before September 19, 1881 (§304 *supra,*) and if not in writing, after the lapse of six years next before September 19, 1881. It is sufficient to say that the fifth, sixth, and seventh paragraphs are all bad for pleading the statute as operating to the time of the commencement of this suit, April 22, 1897, sixteen years after the statute had ceased to run against the State. The fifteen years statute pleaded in the eighth was inapplicable. The ninth paragraph was held good, and the real question arises upon the tenth.

We are unable to concede the contention that appellant's charter is a contract "not in writing," and that there is nothing more in the case than a simple claim for money. It is not essential to a contract in writing that it be signed by both parties. The signature of one, with acceptance by the other of the benefits stipulated, constitutes a written contract. *Midland R. Co.* v. *Fisher,* 125 Ind. 19, 8 L. R. A.

604, 21 Am. St. 189; *Harlan* v. *Logansport, etc., Co.,* 133 Ind. 323; *Indianapolis Gas Co.* v. *Kibbey,* 135 Ind. 357; *Thiebaud* v. *Union Furniture Co.,* 143 Ind. 340; *Leach* v. *Rains,* 149 Ind. 152.

By the act of 1847 certain named persons were constituted the appellant corporation. The terms and conditions upon which the gentlemen named, and their successors, might exercise corporate rights and privileges are specifically set forth, and the rights and liabilities of both the corporation and the State are definitely fixed. The act was duly executed by the grantor of the benefits, by being passed by the General Assembly, and signed by the proper officers of State. Nothing in connection with its terms and conditions rests in parol. The parties, as well as all the terms and stipulations, can be gathered from the instrument itself. Parol evidence is not competent to explain or vary its provisions. It is absolutely its own proof of all it confers and requires, in a stricter sense than is applicable to other written instruments. We find no element of parol contract about it.

(a) There is no force in the argument that to constitute the charter a written contract, binding on both parties, its acceptance must also appear in writing. The public and notorious exercise of the powers and rights conferred is proof enough of acceptance. See authorities last above cited. The act itself declares that it shall be deemed and taken as a public act. §37. Appellant was named in the act as the only party entitled to its benefits, and, under its terms, appellant elected officers, exercised the right of eminent domain, took possession of real estate, constructed a railroad from the west line of the State to Indianapolis, became a busy common carrier of freights and passengers, fixed its own tolls, appropriated its revenues, and six times within the first four years of its existence went into the legislature and procured in its own corporate name, by amendments, extensions and modifications of its charter

rights and duties; and it is shown by the act of 1865 (Acts 1865, p. 89),—a public law, of which we must all take notice,—passed fifteen years after some person or corporation had accepted the charter of 1847, and had constructed the railroad authorized thereby from Terre Haute to Indianapolis, that appellant again appeared before the General Assembly and procured legislation, which provided that the name and style of the company, incorporated and known as the President and Directors of the Terre Haute & Richmond Railroad Company under an act of January 26, 1847, be changed, and that said company shall hereafter be known by the name and style of the Terre Haute & Indianapolis Railroad Company. And further: "As said company completed so much of said railroad as lies between Terre Haute and Indianapolis within the time authorized by the act incorporating said company, * * * and as said company have not completed so much of said line as lies between Terre Haute and a point on the western line of the State of Indiana, within the time prescribed, the said company under the name and style of the Terre Haute & Indianapolis Railroad Company, shall have seven years further time to complete their railroad to a point on the western line of the State of Indiana from Terre Haute." Under these facts the court could not, if it would, close its eyes to the identity of the party that exercised the rights and enjoyed the benefits stipulated in the act of 1847. We therefore hold that said charter act is a written contract between the State and appellant, and the tenth answer insufficient. *Western, etc., Co.* v. *Citizens St. R. Co.*, 128 Ind. 525, 10 L. R. A. 770, 25 Am. St. 462.

This case is not of the class to which *Board, etc.,* v. *Shipley*, 77 Ind. 553, and *Board, etc.,* v. *Crockett*, 111 Ind. 316, relied upon by appellant, belong, and hence the latter cases can not be accepted as authority. Each of these cases is grounded on a general order of the board of commissioners for the payment of bounties to induce enlistment into the

army. In the Shipley case the order directed the auditor to draw his warrant in favor of each volunteer, enlisted, sworn, and mustered into the United States service, and credited to the county. More than six years thereafter Shipley brought an action against the county to collect the sum offered, alleging that he had enlisted and was mustered into the United States service, and credited to the county. The order in these cases amounted to nothing more than an offer. Until the offer was accepted by some one it was not a contract; and whether there was an acceptance, an enlistment, a muster in, a credit to the county, and who the party was, could only be established by extrinsic evidence. It was held in these cases that a contract brought about in this way rested partly in writing and partly in parol, and must be regarded as a contract not in writing. The distinction between these and the case at bar is obvious.

(5) The fourth answer, in general terms, and the eleventh, specially, pleads knowledge, acquiescence, and laches on the part of the State in bar of the action. The argument in support of these answers is that the contract by which the State had a right to participate in the profits of appellant was an ordinary business contract, outside the domain of sovereignty and in making the contract the State submitted itself to the same laws that govern individuals. We are unable to accept this argument. A sovereign, as such, has a right to name the conditions upon which it will grant another the right to exercise a public power; and to require the payment of money, in a contingency that may arise, as a means of preserving equality among those exercising like franchises, and to prevent excessive profits, is not an abdication of sovereignty, or an entrance into the domain of commerce within the meaning of the cases cited by appellant.

Appellant is a *quasi* public corporation. Its charter was a matter of public record, equally open to all. The nature

and basis of the State's claim was accessible to all dealers in its stocks and bonds. The action in *quo warranto* in Owen county in 1874, and the suit in the Marion Superior Court in 1875, were public proceedings, and the legal effect of the orders and judgments was equally known to all. That there has been much procrastination is beyond dispute, but a wise public policy has long since forged the rule, now everywhere adhered to, that the state shall not be made to suffer from the delays or negligence of its public officers. *United States* v. *Kirkpatrick,* 22 U. S. 720, 735, 6 L. Ed. 199; *Crane* v. *Reeder,* 25 Mich. 303, 320; *Farish* v. *Coon,* 40 Cal. 33, 50; *State* v. *Bevers,* 86 N. C. 588, 592; *Wallace* v. *Maxwell,* 10 Ired. (N. C.) 110, 112, 51 Am. Dec. 380; *Gibbons* v. *United States,* 8 Wall. 269, 19 L. Ed. 453; *People* v. *Brown,* 67 Ill. 435.

"It is a familiar doctrine," says the court in the last cited case, "that the state is not embraced within the statute of limitations, unless specially named, and, by analogy, would not fall within the doctrine of estoppel. Its rights, revenues and property would be at fearful hazard, should this doctrine [estoppel] be applicable to a state. A great and overshadowing public policy of preserving these rights, revenues, and property from injury and loss by the negligence of public officers, forbids the application of the doctrine. * * * The doctrine is well settled that no laches can be imputed to the government, and by the same reasoning which excuses it from laches, and on the same grounds, it should not be affected by the negligence or even wilfulness of any one of its officials."

(6) Appellant has assigned errors calling in question the action of the court in overruling certain of its exceptions, and in sustaining certain of appellee's exceptions, to the master's report. The exceptions relate to specific facts and conclusions stated in the master's report. There was no request by either party for a special finding, and the ques-

tion arises, whether the action of the trial court upon the several exceptions to, and items of, the master's report, and its conclusions of law stated thereon, is anything more or less than a special finding under the statute, made without request so to do.

It has become well settled in this State, since the code of 1852, that a written finding of specific facts and conclusions of law thereon, made by the court without a request from either party, amounts to nothing more than a general finding, and an appellate tribunal has no right to regard such unauthorized findings for any purpose other than as a general finding. *Sheets* v. *Bray,* 125 Ind. 33; *Jacobs* v. *State,* 127 Ind. 77; *Nelson* v. *Cottingham,* 152 Ind. 135.

As before stated, there appears in this record what purports to be the trial court's finding and conclusions of law on divers exceptions filed by both the plaintiff and the defendant to the master's report, without a request by either party for such finding.

This action was brought for an accounting, and is therefore a suit in equity *(Field* v. *Brown,* 146 Ind. 293), and it becomes necessary for us to inquire whether the above rule applies to trials in suits in equity of this class, as well as to trials in actions at law. The evident purpose of our practice code was to sweep away the useless forms and fictions of the old practice in courts of equity, as well as in courts of law, and to abridge, simplify, and cheapen remedial procedure in both jurisdictions. That both courts are subject to the same general rules, is declared in the first line of the code, to wit: "There shall be no distinction in *pleading* and *practice* between actions at law and suits in equity." §249 Burns 1901. Further along in the scheme of reform it is provided (§412 Burns 1901) that "issues of law and issues of fact in causes that, prior to the 18th day of June, 1852, were of exclusive equitable jurisdiction, shall be tried by the court; * * * Provided, that in

all cases triable by the court as above directed, the court, in its discretion, for its information, may cause any question of fact to be tried by a jury, or the court may refer any such cause to a master commissioner, for *hearing* and *report."* Attention is called to five things in this latter statute: (1) The subject is equity causes; (2) the trier is termed "the court;" (3) issues of law and issues of fact in such cases shall be tried by the court; but (4) the court may, for its information, cause questions of fact to be tried by the jury; or (5) it may refer any such cause to a master for hearing and *report,* not for final determination.

Further upon the subject of trials it is provided (§560 Burns 1901) that "Upon trials of questions of fact by the court, it shall not be necessary for the court to state its finding, except generally for the plaintiff or defendant, unless one of the parties request it, * * * in which case the court shall first state the facts in writing, and then the conclusions of law upon them, and judgment shall be entered accordingly."

Under this legislation, it is the court whose judgment is invoked that must finally decide. It may refer questions of fact to the jury, or the cause to a master, but it can not abdicate its power, nor confer upon another the absolute performance of any of its judicial functions. The master commissioner to whom a reference may be made is but an assistant of the court. He may be authorized to collect and analyze the evidence, state accounts, and other facts supposed to be proved, and may even express opinions on the law of the case, and do any other thing that goes to enlighten the court, or relieve it of the minor details of a suit, that does not supplant it in any of its rightful powers. This, however, is the limit of his authority.

In this case the master was commissioned to, and did, report to the court the evidence, the facts supposed to be

proved thereby, and the law that was supposed to govern such facts. This was all it was possible for him to do. The statute governing the reference conferred upon him power, not to hear and determine, but to hear and report his conclusions to the court, who by the same statute is required to try all issues of law and issues of fact involved in the case. It necessarily follows that the master's report, in all its features, is advisory only. *Lewis* v. *Godman,* 129 Ind. 359; *Bremmerman* v. *Jennings,* 101 Ind. 253; *McKinney* v. *Pierce,* 5 Ind. 422.

The trial is before the court from beginning to end. The agency of the master commissioner is but a means of bringing the evidence before the court, as in some other cases it is brought by depositions, and in others by the witnesses themselves, and as an aid to the court in the performance of its duties. The master's conclusions of law and of fact are recommendations only that the court will consider in the light of the accompanying evidence and adopt as its own such as it approves, and reject such as it disapproves; and when the report has been fully considered, and the exceptions thereto fully disposed of, and noted in writing, as in this case, there is no substantial difference in a record of facts and conclusions of law thus made, and in a special finding and conclusions of law made by the judge in the trial of an action at law where there is no request for a special finding under the statute. The record in both cases exhibits facts and conclusions of law that ultimately become those of the trial judge, and they must be held to be the same in legal effect. The signed writing or record of a trial judge, containing the approved and disapproved items of a master's report, and the conclusions of law stated in ruling upon exceptions thereto, is in every just sense a special finding, and, when made without a request from one party or the other, is a general finding only; and as specific findings and rulings can form no basis for appealable error.

It follows, therefore, that all errors assigned which challenge the action of the court in sustaining or overruling exceptions to the master's report present no question for our determination; neither do said alleged errors, for the reasons given, furnish any ground for a new trial.

(7) Some additional questions are argued under the motion for a new trial.

During the Civil War period the company paid to the national government revenue taxes amounting in the aggregate to $117,137, and counsel, in their briefs, have done "royal battle" over the question whether such taxes were paid as an excise on the earnings, and so a charge against the corporation, or as a tax on the dividends declared, and so a charge against the stockholders; the point being that, if the former position is true, the payments must be treated, in this accounting, as operating expenses, and if the latter is correct, they must be treated as dividends, and considered in estimating the return of the capital invested. The question, however, becomes unimportant in the view we have taken of the case.

As the finding of the court is general we are without information, or means of information, as to the details by which the court reached its final conclusion; and our only province, therefore, is to determine whether, from all the evidence, enough items sued for are sustained to equal the amount of the plaintiff's recovery; and if this is found in the affirmative, it can make no difference to the defendant through what process of reasoning the trial court reached the results obtained. *Sheets* v. *Bray,* 125 Ind. 33; *Jacobs* v. *State,* 127 Ind. 77; *Stone* v. *United States,* 164 U. S. 380, 383, 17 Sup. Ct. 71, 41 L. Ed. 477; *British Queen Mining Co.* v. *Baker, etc., Co.,* 139 U. S. 222, 11 Sup. Ct. 523, 35 L. Ed. 147.

It will be recalled that the original franchise authorized the construction of a railroad from the western line of the

State, through Terre Haute and Indianapolis, to Richmond, the construction to be completed within fifteen years from the granting of the charter (1847); that the charter stipulated that the company should have the right to construct the road in such divisions or parts as its interests required, and, upon the completion of any part, the rights and obligations imposed by the charter should apply to any completed part in the same way and to the same extent as to the completed whole; that under this authority the road was completed and opened for business between Terre Haute and Indianapolis in 1851, was a money-maker from the beginning.

The undisputed evidence shows that in every year after 1852 to 1873 the corporation had a surplus of earnings after the payment of expenses and dividends, and such surplus in 1869 amounted to $1,049,365. From 1869 to 1871, both inclusive, the company expended for branches, sidings, equipment, and an extension from Terre Haute to the Illinois state line, the sum of $863,855, $448,959 of which was absorbed in the construction of the Illinois extension. The surplus referred to was at the time chiefly invested in profit-bearing bonds and stocks, and the company, doubtless deeming it more profitable to keep its securities, borrowed $800,000 by the issue of bonds secured by mortgage on its property, and perhaps used part, if not all the money, in the execution of said several works.

Whatever may be said of the other expenditures of that period, it seems very clear, for reasons given in a former part of this opinion, that the amount used in the extension to the Illinois state line cannot be treated as an operating expense, or as a part of the capital invested within the sense of section twenty-three of the charter.

The time limit for the building of the road expired in 1862, and the railroad had then been completed and in suc-

cessful operation between Terre Haute and Indianapolis for eleven years, and the construction account of the road had been formally closed on the books of the corporation (1856) for five years, without any step having been taken looking to the construction from Terre Haute to the Illinois state line, beyond procuring the right to do so in its original charter. Three years after the forfeiture of its right to build to the Illinois line (1865), the company, under the name of the Terre Haute & Indianapolis Railroad Company, by a so-called amendment to its charter, procured from the legislature authority to make said extension.

The latter action of the legislature was neither an amendment nor an extension of a former right, for there was then nothing to amend or extend, but the authority given was the creation of a new right in every sense the same as if no such right had once existed under the old charter. The extension was not necessary to the successful conduct of the company's business. It was not a renewal, nor a needed improvement. It was simply an addition to the company's property. The right of the corporation to invest its surplus in proper channels will not be denied, but to employ its accumulated net earnings in the expansion of its property and assets, to the exclusion of the State, can not be conceded. Under the charter it was the duty of the directors to divide surplus profits, as they arose, among the stockholders, as dividends; and if the duty had been performed the day of reckoning with the State would have been hastened by several years, and it would be grossly inequitable to permit them to eliminate the rights of the State by withholding and diverting such profits into other forms.

From the evidence, therefore, which is almost wholly undisputed, the accounting comes to this:

| | | |
|---|---:|---:|
| Total dividends declared to December 31, 1871 | $3,601,212 | |
| Deduct total government taxes | 117,137 | |
| | | $3,484,075 |
| Total capital invested | $1,216,690 | |
| Add ten per cent. per annum from several dates of investment to December 31, 1871 | 2,074,281 | |
| | | $3,290,971 |
| Excess of dividends over capital and ten per cent | | $193,104 |
| Add net earnings for 1870 and 1871, less amount of dividends declared for same years | | 138,552 |
| Add total net earnings for 1872 | | 296,589 |
| Add unexpended surplus of December, 1869, being $1,049,365, less $863,855 expended in 1869, 1870 and 1871 | | 185,510 |
| Plus amount expended in extension to Illinois | | 448,959 |
| | | $1,262,714 |
| Deduct fifteen per cent. on capital invested ($1,216,690) from December 31, 1871, to January 17, 1873 | | 182,503 |
| | | $1,080,211 |
| Even deducting for contingent expenses of 1873, as claimed | | 100,000 |
| And the balance apparently due the State is | | $980,211 |

To which might be added interest from date of demand.

It will thus be seen that excluding the government taxes the finding and judgment against appellant might have been for a much larger sum, and was clearly within the evidence. ·

What has been said in former pages disposes of the seventh, eighth, and ninth causes for a new trial.

(8) The court did not err by referring the cause to a master. *Field* v. *Brown,* 146 Ind. 293.

The cross-errors assigned, and not waived, call in question the action of the trial court in overruling appellee's motions to modify the judgment. The trial court, as we have seen, made a general finding and rendered judgment thereon for the amount of the finding. There is nothing, therefore, in the record showing that the motions to modify were not properly overruled.

Judgment affirmed.

Jordan, J., concurs in part and dissents in part.

## Opinion Concurring and Dissenting in Part.

Jordan, J.—I can not unconditionally vote to affirm the judgment in this case, and may state that it appears to me that the majority of the court has indulged in an unwarranted procedure in holding that the amount awarded to appellee by the judgment below should be affirmed, without regard to the federal taxes, which the trial court, as is disclosed by its ruling on the exceptions, included as a part of the amount of recovery. If the amount of the federal taxes in question be remitted, then the amount of recovery remaining, in my opinion, will represent the extreme limit to which the State was legitimately entitled. This court seems to have reached the conclusion on the question in respect to the amount to be recovered, not by confining itself to a review of the rulings of the trial court on the exceptions filed to the findings and conclusions of the master commissioner on the point relative to what items should be included in constituting or making up the amount of re-

covery, but has wholly disregarded this question or issue as the same was presented and raised by the exceptions filed below, and dismisses the several exceptions, and the rulings thereon, as of no avail in presenting any question for review in this case. Especially is the point or proposition disregarded, and not reviewed, which was determined adversely to appellant below, on the exception to the finding and conclusion of the commissioner in regard to its being entitled to a credit for the amount of the taxes which it paid to the federal government. I concede the right of the trial court to have set aside or rejected, as a whole, the findings and conclusions of the master, and to make its own finding upon the evidence in respect to the amount that ought to be recovered in this action. But this right, however, the trial court did not exercise. It is not disclosed that the court, on the evidence reported by the master, made a general finding without regard to its ruling on the exceptions upon this point, but it is evident that it decided the particular question on the specific exception made to the report of the commissioner. Or in other words, the trial court when it sustained an exception to certain parts of the report of the the commissioner, thereby in effect substituted its conclusion in the place of that stated by the master; and when it denied an exception, by such ruling, it, in effect, asserted that it adhered to and approved the finding or conclusion of the master commissioner. The exceptions and rulings thereon in respect to the recovery, as presented, are to be treated as constituting a special finding and conclusions by the court, and the parties have so considered them by basing assignments of error thereon. *McCutchen* v. *McCutchen*, 141 Ind. 697. Under the rules pertaining to chancery practice, the findings and conclusions of a master are considered as in the nature of a special finding, and the right of the parties to present questions for review by means of exceptions thereto is recognized. This practice can not be said to be abrogated by the provisions of the civil code

NOVEMBER TERM, 1902—Vol. 159.     489

Torre Haute, etc., R. Co. v. State, ex rel.

pertaining to special findings. In fact, it may be said that such practice is at least impliedly recognized by the provisions of the code under which circuit and superior courts are empowered to appoint a master commissioner to report the evidence, etc. The opinion of the majority shows that this court rejects the question in regard to the amount to be recovered, as presented and raised by these several, exceptions, and has virtually usurped the rights of the lower court, by making its own finding upon the evidence to sustain the amount of the judgment; thereby considering not only the items which the trial court allowed, but also those which it rejected and refused to allow in favor of the State. In other words, the opinion affirms that it is wholly immaterial whether the lower court was right or wrong in declining to credit appellant with the federal taxes in question, for the reason that there are other items which the trial court, as disclosed by its rulings on the exceptions, refused to allow in favor of appellee in assessing the amount of recovery, which, when considered in this appeal, this court holds are more than sufficient to supply the deficiency which would result if the amount paid out by appellant as an excise tax was allowed to its credit.

The conclusion apparently reached is that the action of the trial court in denying appellant the right to a credit for these taxes, even though erroneous, must be deemed and treated as harmless. When the procedure or action of the court in finding, by the method employed, that the amount of recovery should be sustained, is considered, it is evident, in my opinion, that such procedure, under the circumstances, is wholly unwarranted by the rules of law governing the review of the question as herein involved and presented in relation to the proper amount of recovery. The exceptions and rulings thereon by the trial court certainly serve to expose or indicate in this appeal the views of the trial court in its application of the law in regard to what items ought to be, and what ought not to be, taken into

Butt *v.* Lake Shore, etc., R. Co.

consideration in assessing the amount which appellee is entitled to recover.

I concur with the majority of the court in its ultimate conclusion so far as it affirms appellee's right to recover in this action, and would vote for an affirmance generally, on the condition that the State be required to remit the amount as measured by the federal taxes paid by appellant. That the latter is entitled to this credit I think is settled by the following decisions of the United States Supreme Court: *Railroad Co.* v. *Collector,* 100 U. S. 595, 25 L. Ed. 647; *United States* v. *Erie R. Co.,* 106 U. S. 327, 27 L. Ed. 151; *Memphis, etc., R. Co.* v. *United States,* 108 U. S. 228, 2 Sup. Ct. 482, 27 L. Ed. 711.

These decisions construe the act of congress under which the taxes were imposed, and by them,—the question arising on the construction of the federal act in controversy,—this court is bound, and it is not within its province to modify or overrule them.